Afroza HASAN; Khandker Nazmul Hasan, Petitioners,

v.

John ASHCROFT, Attorney General, Respondent.

No. 02–73867.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 29, 2004.

Filed Aug. 18, 2004.

Carlos Cruz (argued), Los Angeles, CA, for the petitioners.

Alison Drucker (argued), Office of Immigration Litigation, U.S. Department of Justice, Washington DC, for the respondent.

Margaret J. Perry, Senior Litigation Counsel, Office of Immigration Litigation, U.S. Department of Justice, Washington DC, for the respondent.

Before D.W. NELSON, FERNANDEZ, and KLEINFELD, Circuit Judges.

D.W. NELSON, Senior Circuit Judge:

Afroza and Khandker Hasan, husband and wife, and native citizens of Bangladesh, petition for review of the Board of Immigration Appeals' denial of their requests for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). The Immigration Judge ("IJ") found that the Hasans had failed to establish that their past persecution was on account of an enumerated ground, and therefore dismissed their claims for asylum and withholding of removal. The IJ also found that the Hasans had failed to establish that, upon their return to Bangladesh, they were more likely than not to experience torture with the consent or approval of government officials acting in their official capacity, and therefore, denied them relief under CAT. The Board of Immigration Appeals ("BIA") affirmed the decision of the IJ without opinion.

We have jurisdiction pursuant to the Immigration and Nationality Act ("INA") § 242(a)(1), 8 U.S.C. § 1252(a)(1). We find that substantial evidence supported the IJ's conclusion that the Hasans had not established eligibility for CAT relief. However, the IJ erred in concluding that the Hasans had not established that their past persecution was on account of political opinion. Accordingly, we grant the petition for review and reverse and remand to the BIA for further proceedings consistent with this opinion.

## I. Factual and Procedural History

The following facts are drawn from the Hasans' testimony at their asylum hearing, as well as their written application for asylum. Because the IJ did not make an adverse credibility finding, we accept the Hasans' testimony as true. *See Damon v. Ashcroft*, 360 F.3d 1084, 1086 n. 2 (9th Cir.2004).

### A. The Hasans' Experiences in Bangladesh

Afroza Hasan (hereinafter "Afroza," in order to distinguish her from her husband "Khandker"), the lead petitioner, worked as a reporter for Purnima, a local newspaper in Bangladesh. She primarily reported on women's issues in the region in which she lived. Afroza was a member of the Bangladesh Nationalist Party ("BNP"), one of Bangladesh's major political parties. She was also a member of Mohila Parishad, a women's organization that served distressed women in the region.

In 1995, Afroza wrote an article that criticized a member of the local government who worked for Chairman Abu Jaher (hereinafter "the Chairman"), an important government leader in the region, who was chairman of the local union parishad— the Dhaka Union Parishad. The Chairman was a member of the Awami League, another of Bangladesh's major political parties, which assumed control of the national government in 1995. Shortly after the article came out, Afroza was approached by the person her article had criticized, as well as two other people. They threatened her, demanding that she stop writing or, as she described it during the hearing, "they will break my hand, and I will be burned by the acid."

In 1996, a woman reported to the Mohila Parishad that she had been raped by the Chairman. When she went to file a police report, the Chairman identified her as a prostitute. The woman's husband di-

vorced her and she committed suicide. Before killing herself, she told Afroza of two people who could serve as witnesses to the Chairman's crimes. Based on these and other sources, Afroza wrote a report that described the Chairman as a "godfather" in the region, with a gang of followers who carried out a wide range of criminal activities: drug deals, misappropriation of money and foodstuff, bribery, and terrorizing of the population. Afroza's editor promised not to put her name on the article, but when the article was published, on November 11, 1998, it had her name prominently displayed as the author.

On November 14, 1998, a group of "people of the Chairman" attempted to attack Afroza in multiple incidents throughout the night. First, a group of fifteen to twenty men broke into one of Afroza's two apartments, which was located near her parents' home. It was empty at the time, and the men ransacked it. Then, they went to her parents' apartment in search of Afroza. They punched her father, pulled off her mother's sari, and shouted and cursed at them, including the following, as paraphrased by Afroza at the hearing: "Your ... daughter writes, and ... get involved with the women's organization. First we will let your daughter be (indiscernible) and then we will bite her like a vulture."

After leaving her parents' home, the Chairman's men found Khandker in his car a short distance away from his apartment. They stopped his car, broke the glass, pulled him out of the car through the glass, punched and beat him with sticks, attempted to stab him, and shouted at him, "Why didn't you stop your wife, and how do you let your wife do all this bad things? And your wife wrote against our boss, how come you didn't stop her?" Some of the men began arguing about when and where to kill him. At that point, Khandker was knocked unconscious, and awoke to learn

that some of his friends had taken him to the hospital. He was hospitalized for three days after the incident.

Finally, the group of men came looking for Afroza in the apartment she lived in with Khandker, where she was staying that night. She heard them break down the main gate and she ran away through the back gate. As she ran, she fell, injuring her nose and stomach. While she hid in a neighboring house, they set fire to her bedroom. Afroza was hospitalized for two days for treatment of the injuries from her fall.

The day after these attacks, November 15, 1998, Purnima published an article describing "a group of gang men" who attacked Afroza's parents, husband, and homes. The article reported that the special report by Afroza published on November 11 had "enraged the chairman ... who in turn set out his gang members to take revenge." The record contains this article, as well as photos of women marching to protest the attack on Afroza in the days following November 14.

Also on November 15, Afroza's father went to the police in Bandar, where his house was located, to report the incidents. The Bandar police refused to take down a report. Her father then went to the police in Narayangonj, where Khandker's apartment was located. The Narayangonj police made a "general diary" of the incidents, but they never undertook any follow up. No one was ever arrested for the attacks that night.

After the Hasans were released from the hospital, they stayed in hiding with various relatives in and around Dhaka for two months. While they were in hiding, the Chairman posted a poster with Afroza's photograph on it, which stated:

DO ARREST AND METE OUT EXEMPLARY PUNISHMENT TO AFROZA SULTANA JOURNALIST AND MEMBER OF THE "MOHILA PARISHAD SAMITY" FOR HER ALLEGED INVOLVEMENT THROUGH THE SAID SAMITY IN ANTI ISLAMIC ACTIVITIES ... [1]

Afroza testified that the Chairman's purposes in posting the sign were "to locate me ... and to hang me as a bad character, and to portray himself as a good person in the society." Afroza made sure she was always covered when she went outside during this period, and Khandker's family refused to help the Hasans because Afroza's "picture was everywhere in the poster, and they were feeling insult for that."

The Hasans fled to the United States on February 14, 1999. After they arrived in this country, the police came looking for Afroza in Bangladesh. They beat up her brother for refusing to disclose Afroza's whereabouts. When they learned that she had left the country, they told her father, "The day your daughter will land in ... Bangladesh that will be her last day." Men working for the Chairman also visited Khandker's factory and demanded money from his partner.

The Hasans entered the United States with visitor visas and overstayed their six-month authorized stay. In March 2000, the Immigration and Naturalization Service initiated removal proceedings. The Hasans conceded removability and applied for asylum and withholding of removal pursuant to 8 U.S.C. §§ 1158(a) and 1231(b)(3), and withholding of removal under CAT pursuant to 8 C.F.R. §§ 208.16(c) and 208.18.

---

**1.** The poster referred to Afroza by her maiden name, "Afroza Sultana" rather than "Afroza Hasan." At the hearing, Khandker testified that Afroza continued to use her maiden name in her work as a journalist.

## B. The Asylum Hearing

At the hearing before the IJ, the Hasans each testified to the foregoing experiences. As rebuttal, the government offered documentary evidence of changed country conditions in Bangladesh since the Hasans' departure. In particular, the government submitted three articles describing the 2001 election of a new prime minister, Khaleda Zia, a woman and a member of the BNP. The Hasans both testified that they did not think this change in country conditions since their departure would change the danger they faced.

Khandker testified that the Chairman can change political parties at will, and that his local power is not tied to what party happens to be in control of the national government. Khandker also testified that they could not safely live in another part of the country because, "[The Chairman] has maintenance of groups not only his locality. He has (indiscernible) in lot of places, they deal with drugs. Also, he controlling those places, the criminals and police administration."

Neither the government attorney nor the IJ asked Afroza any questions about whether the new political party in power would change the extent of the Chairman's control. They also asked her nothing about potential resettlement in other parts of the country.

At the close of the hearing, the IJ issued an oral decision. She found that, "assuming the respondents to be persuasive witnesses," they failed to establish eligibility for asylum because they did not demonstrate that the persecution they suffered was on account of one of the statutory grounds. In particular, the IJ found that

the case boiled down to a personal vendetta by the Chairman against Afroza. The IJ stated, "The only opinion this woman has that has provoked ire in the chairman is that she thinks he's a crook. That's not a political opinion."

The IJ also denied the Hasans CAT relief. She found that the Chairman and his henchmen were not acting in their public capacities when they attacked the Hasans. She also found that the Hasans failed to demonstrate that it was more likely than not that they would be tortured if they were to return to Bangladesh, particularly since they could relocate to another area of the country and avoid the Chairman altogether.

The Hasans timely appealed to the BIA, which affirmed the IJ without opinion. The Hasans then timely filed this petition for review.[2]

## II. Standard of Review

■■■ We review the BIA's decision on whether the petitioner has established eligibility for asylum under the substantial evidence standard. *Singh v. INS*, 134 F.3d 962, 966 (9th Cir.1998). This requires that we may only reverse the BIA's decision if "Petitioner presented evidence 'so compelling that no reasonable factfinder could find' that Petitioner has not established eligibility for asylum." *Id.* (quoting *INS v. Elias–Zacarias*, 502 U.S. 478, 483–84, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992)). Here, because the BIA issued no opinion, we review the IJ's decision as the final agency determination. 8 C.F.R. § 1003.1(a)(7)(iii);[3] *see also Falcon Carriche*, 350 F.3d at 849.

---

2. In addition to challenging the IJ's asylum, withholding of removal, and CAT determinations, the Hasans also raise a due process challenge to the BIA's use of streamlining procedures. This argument has been fore-

closed by *Falcon Carriche v. Ashcroft*, 350 F.3d 845, 848 (9th Cir.2003).

3. This section was formerly 8 C.F.R. § 3.1, and was redesignated as § 1003.1 on February 28, 2003.

### III. Discussion

#### A. The Asylum Claim

#### 1. The Hasans Suffered Past Persecution on Account of Political Opinion

■ The IJ concluded that the Hasans were not eligible for asylum because, although they established past persecution, she found that they had failed to establish that the persecution was on account of any of the statutory grounds. *See* 8 U.S.C. §§ 1158(b)(1) and 1101(a)(42)(A). This conclusion runs counter to both the evidence in the record and our caselaw regarding what constitutes persecution on account of political opinion.

In *Grava v. INS*, 205 F.3d 1177 (9th Cir.2000), we addressed the question of whether retaliation for the act of publicizing corruption amounts to persecution on account of a political opinion. In *Grava*, the petitioner was a law enforcement officer in the Bureau of Customs in the Philippines, who experienced persecution after he exposed smuggling schemes within the Bureau. We held that,

> The Board erred in concluding that Grava's whistleblowing could not constitute an expression of political opinion because he did not concomitantly espouse political theory. When the alleged corruption is inextricably intertwined with governmental operation, the exposure and prosecution of such an abuse of public trust is necessarily political.

*Id.* at 1181.

Like Grava's act of whistleblowing, Afroza's article was a political statement despite the fact that she did not espouse a political theory. The text of the article provided in the record reveals that, contrary to the IJ's characterization, Afroza did more than call the Chairman a "crook." She accused him of organizing a cadre of "terrorism, repression, and extortion," of "misappropriation of public money," of "collect[ing] tolls for his own while giving

hookup connection[s] for water and gas lines," and of making his political office "an office of corruption." These are indisputably political issues.

In *Grava*, we emphasized that "the salient question" in determining whether the act of whistleblowing is political is whether it was "directed toward a governing institution, or only against individuals whose corruption was aberrational." *Id.* The government attempts to distinguish this case from *Grava* by arguing that the corrupt practices of the Chairman are properly characterized as "aberrational." This argument is undermined by the text of the article itself, which is filled with references to the systemic nature of the Chairman's corruption. In her analysis of the article, the IJ failed to consider such statements as, "Police and other members of the law and order enforcement department [are] indifferent to [the Chairman's cadre]," the Chairman "openly says that he has effective influence over ministers and high command of the government," and "River police overlook[ ] these [smuggling] activities."

■ Taken as a whole, the article describes an institutionalized level of corruption that goes far beyond an individual, anomalous case. The scale of the bribes, misappropriation of money, and smuggling described is not the work of a single man, but of an elaborate network that he directs. This comes across in both the article and in Afroza's testimony, including the following exchange:

Q: But having written this report, was there an action by the authorities taken against the chairman?

A: No, because with him there were other senior officials involved, and also he was senior member of the government.

When a powerful political leader uses his political office as a means to siphon public money for personal use, and uses political connections throughout a wide swath of government agencies, both to facilitate and to protect his illicit operations, exposure of his corruption is inherently political. *See, e.g., Reyes–Guerrero v. INS*, 192 F.3d 1241, 1245 (9th Cir.1999) (holding that an investigation into white collar crimes committed by politicians in Colombia, where the criminal justice and political systems are closely intertwined, is, "by its very nature, political"); *Desir v. Ilchert*, 840 F.2d 723, 727–28 (9th Cir.1988) (noting the substantial evidence in the record that the Haitian government operated as a " 'kleptocracy,' or government by thievery, from the highest to the lowest level," and concluding that persecution due to "Desir's refusal to accede to extortion in a political system founded on extortion" was motivated by political rather than personal interests); *cf. Kozulin v. INS*, 218 F.3d 1112, 1117 (9th Cir.2000) (holding that a letter to a ship's captain, accusing him of corruption, was not a political opinion, since the letter was an "apolitical accusation," threatening the "minikleptocracy of the captain of his ship") (internal quotation marks omitted).

Thus, the IJ's conclusion that the article did not express a political opinion is clearly at odds with the record and our caselaw. The IJ's reasoning that the Chairman's response amounted to a "personal vendetta" is similarly unsupportable. In *Grava*, we specifically addressed this argument and rejected it, holding,

> Purely personal retribution is, of course, not persecution on account of political opinion. Thus, retaliation completely untethered to a governmental system does not afford a basis for asylum. However, many persecutors have mixed motives. In such instances, personal retaliation against a vocal political opponent does not render the opposition any

less political, or the opponent any less deserving of asylum.

205 F.3d at 1181 n. 3.

As demonstrated by the foregoing discussion of Afroza's article, its content clearly could not be characterized as "completely untethered to a governmental system." The fact that the Chairman's motives were not strictly personal is further demonstrated by the means of retaliation he chose to employ. The message on the poster belies the argument that the terrorizing attacks on Afroza's family and homes were solely acts of personal vengeance. In the poster, the Chairman publicized the need to punish Afroza in terms of her identity as a journalist, a member of a women's organization, and a leader of "anti-Islamic activities." The public nature of a poster, combined with the political substance of its message, makes clear that, in the Chairman's eyes, Afroza was a threat because of her political opinion.

■ Accordingly, we find that the IJ erred in finding the Hasans were not eligible for asylum because they failed to establish the requisite nexus between the persecution they experienced and an enumerated ground. The evidence in the record compels the conclusion that the persecution the Hasans experienced was on account of Afroza's political opinion, as voiced in her article denouncing the Chairman's regime.

*2.  Internal Relocation*

■ The government argues that, even if we find past persecution on account of political opinion, we need not remand because the IJ has already found that the Hasans could relocate elsewhere and avoid the Chairman's local violence. The IJ did briefly comment on the possibility of internal relocation in her decision, however it was only in the context of the Hasans' CAT claim. The IJ stated that one reason the Hasans had failed to prove that it is

**1122**

more likely than not that they will be tortured if they return to Bangladesh was because, "I think it's perfectly possible that they could relocate to another area of the country ... and avoid harm from the chairman altogether."

■ This finding is not an adequate basis upon which to affirm the IJ's decision on the question of asylum eligibility. For one thing, "this court cannot affirm the BIA on a ground upon which it did not rely." *Ernesto Navas v. INS,* 217 F.3d 646, 658 n. 16 (9th Cir.2000). The IJ— whose decision represents the BIA's final determination—did not rely on the possibility of relocation in making her decision to deny the Hasans' requests for asylum and withholding of removal.

■ Furthermore, the legal standard for considering the possibility of relocation is different in the context of a CAT claim than in an asylum claim. *Cf. Kamalthas v. INS,* 251 F.3d 1279, 1283 (9th Cir.2001). Under CAT, the burden is on the applicant to show that it is more likely than not that she will be tortured, and one of the relevant considerations is the possibility of relocation. 8 C.F.R. §§ 208.16(c)(2) and 208.16(c)(3)(ii). In contrast, in the asylum context, once the petitioner has established past persecution on account of an enumerated ground, the burden is on the government to prove that the applicant could avoid persecution by relocating to another part of the country and that it would be reasonable to expect her to do so. 8 C.F.R. § 208.13(b)(3)(ii).

■ Adequate consideration of whether or not the government has met this burden requires far more than the IJ's one sentence comment and the sparse evidence in the record regarding the possibility of internal relocation. The only relevant evidence in the record was Khandker's testimony, quoted above, in which he said that the Chairman's criminal and police connections in other localities made it unsafe for

him and Afroza to return, even if they relocated. The government presented no evidence to the contrary; it simply asserted the possibility of relocation in a single sentence in closing argument. The extent of the government's evidence in this area is particularly weak given the significant showing required to demonstrate the reasonableness of internal relocation. *See Melkonian v. Ashcroft,* 320 F.3d 1061, 1070 (9th Cir.2003) (discussing the regulations governing asylum, which list some of the factors the IJ should consider when evaluating the reasonableness of internal relocation, including, "whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country; administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties") (quoting 8 C.F.R. § 208.13(b)(3) (2001)).

Accordingly, we find that the IJ's discussion of internal relocation did not address the Hasans' asylum claim. Therefore, we remand the case in order for the BIA to consider whether the government met its burden of proof on the questions of changed circumstances and internal relocation. *See INS v. Ventura,* 537 U.S. 12, 16–17, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002).

*B. The CAT Claim*

■ We find that substantial evidence supported the IJ's conclusion that the Hasans failed to establish that they were more likely than not to encounter torture upon their return to Bangladesh. The Hasans bear the burden of presenting evidence to establish "substantial grounds for believing that [they] would be in danger of being subjected to torture in the country of removal." *Kamalthas,* 251 F.3d at 1284 (internal quotation marks omitted).

We agree with two of the IJ's reasons for finding that the Hasans had failed to

meet their burden of proof. First, there was no substantial evidence offered that the future persecution the Hasans would experience would rise to the level of torture. Second, the Hasans have not presented substantial grounds for believing that they would be unable to live elsewhere in the country safely. As previously discussed, in the CAT context, unlike asylum, the petitioners have the burden of presenting evidence to show that internal relocation is not a possibility. 8 C.F.R. §§ 208.16(c)(2) and 208.16(c)(3)(ii). The only evidence the Hasans presented on this question was Khandker's brief testimony in response to the government's questioning. Accordingly, we find that substantial evidence supported the IJ's decision to deny CAT relief.[4]

### IV. Conclusion

We reverse the IJ's finding that the Hasans failed to establish past persecution on account of political opinion. We remand for the BIA to determine whether the government has rebutted the presumption of future persecution, and to reconsider whether to exercise its discretion on behalf of the Attorney General with regard to the Hasans' applications for asylum and withholding of removal. We deny the petition with regard to the Hasans' CAT claim, as the IJ's decision to deny CAT relief was supported by substantial evidence.

PETITION GRANTED IN PART AND DENIED IN PART; REMANDED.

---

**4.** The IJ also based her conclusion regarding CAT relief on the finding that the actions undertaken by the Chairman and his henchmen were not done in their public capacities. We need not reach this finding, because we find the other bases for the IJ's decision—the possibility of internal relocation and the lack of evidence of the likelihood of torture—to be sufficient.

