# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

VIKTOR YAROSLAVOVICH SAGAYDAK;
NATALIYA BOGDANIVNA SAGAYDAK,
                *Petitioners,*

        v.

ALBERTO GONZALES,* Attorney
General,

                *Respondent.*

No. 02-74299

Agency Nos.
A77-424-463
A77-424-462

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
May 6, 2004—Seattle, Washington

Filed May 4, 2005

Before: Procter Hug, Jr., A. Wallace Tashima, and
Richard A. Paez, Circuit Judges.

Opinion by Judge Paez;
Partial Concurrence and Partial Dissent by Judge Tashima

---

*Alberto Gonzales is substituted for his predecessor, John Ashcroft, as Attorney General of the United States, pursuant to Fed. R. App. P. 43(c)(2).

## COUNSEL

Tom Youngjohn, Federal Way, Washington, for the petitioners.

Leslie McKay, Washington, D.C., for the respondent.

## OPINION

PAEZ, Circuit Judge:

To be eligible for asylum, an alien must, absent changed or extraordinary circumstances, file an asylum application within one year of arriving in the United States. 8 U.S.C. § 1158(a)(2). In the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Congress made clear that "no court shall have jurisdiction to review any determination of the Attorney General" with respect to whether the alien had met the one-year deadline or had failed to satisfy this time limit because of extraordinary circumstances. Pub.L. 104-208, § 604, 110 Stat. 3009-691 (1996) (codified at 8 U.S.C. § 1158(a)(3)); *see also Hakeem v. INS*, 273 F.3d 812, 815 (9th Cir. 2001). However, in this case, we are confronted with an unusual situation: The lead petitioner argued that his untimely filing was due to extraordinary circumstances, but both the Immigration Judge ("IJ") and the Board of Immigration Appeals ("BIA") failed to address the issue. We hold that when the Attorney General fails to make a "determination," this court has jurisdiction to grant the petition and remand the case so that the agency charged with making this determination can properly do so.

Both petitioners also argued that they were targeted by their alleged persecutors on account of a protected ground. *See* 8 U.S.C. § 1101(a)(42)(A). The IJ disagreed, and the BIA summarily affirmed. We find that substantial evidence does not support the IJ's conclusion that the petitioners were targeted purely for personal punishment or revenge, rather than on the basis of Viktor's implied or actual political opinion, and we remand for the BIA to determine whether the petitioners have satisfied the remaining eligibility requirements for asylum, 8 U.S.C. § 1158, and withholding of removal, 8 U.S.C. § 1231.

## I.

The petitioners in this case, Viktor and Nataliya Sagaydak, are citizens of Ukraine. Before immigrating to the United States, Viktor worked as a tax auditor for the Ukrainian government. During an audit of the Hidro Corporation ("Hidro"), Viktor uncovered an illegal tax-evasion scheme. Viktor discovered that Hidro, founded by a high-ranking government official, had evaded the payment of automobile import duties. When Viktor reported his findings to officials at Hidro, they attempted to bribe Viktor to change his report. They first offered him an envelope filled with valuable American dollars, and after he refused, they offered a vacation to Germany. Viktor refused both bribes and referred the matter to local prosecutors.

Ten days later, two men forcibly removed Nataliya from a bus and warned her that her husband "should be more agreeable with us, because if he will not agree with us, we know what we will do." Nataliya suffered a miscarriage three days after being assaulted, which she attributed to this incident.

Viktor also began receiving threats. Callers warned him to change his report, and reminded Viktor of Nataliya's abduction. A Hidro henchman also informed Viktor that "we will make a powder out of you."

Fearing for his safety, Viktor arranged for his cousin to drive him to work. While Viktor's cousin was driving alone in his car, equipped with tinted windows, he was shot. The cousin was supposed to be chauffeuring Viktor at that time, but Viktor had cancelled at the last moment. A Hidro thug warned Viktor that "next time, we are not going to shoot your brother, we will shoot you."[1]

Viktor fled to the United States and arrived on September 17, 1997. After he had left Ukraine, the Sagaydaks' apartment was vandalized. Nataliya then joined Viktor in the United States. Even though both had left the country, two men threatened Viktor's father after inquiring about Viktor's whereabouts. Members of Nataliya's family were also involved in a suspicious car accident that Nataliya suspects was caused by Hidro officials.

Viktor filed for asylum on November 18, 1998, and included Nataliya in his application. During the removal proceedings, the IJ noted that Viktor had failed to apply within one year of arriving in the United States.[2] The Sagaydaks' attorney asked the IJ to consider the fact that Viktor had contacted his prior attorney long before the one-year deadline passed. The IJ responded that it was "not within his authority" to take that fact into account because, the IJ explained, federal law automatically precludes an alien from applying for asylum after being in the United States for more than one year.

The IJ explicitly found Viktor's testimony to be credible, and did not comment on Nataliya's credibility. We therefore accept each of their testimony as true. *See Mashiri v. Ash-*

---

[1]Viktor testified that the Ukrainian language does not distinguish the words "brother" and "cousin," and that this misstatement was simply an error in translation.

[2]Nataliya, on the other hand, arrived in the United States on February 13, 1998, and the IJ found that she was therefore eligible for asylum despite the lead applicant's ineligibility.

*croft*, 383 F.3d 1112, 1119 (9th Cir. 2004); *Kalubi v. Ashcroft*, 364 F.3d 1134, 1137 (9th Cir. 2004). The IJ nonetheless denied the Sagaydaks' applications for asylum, as well as their applications for withholding of removal under 8 U.S.C. § 1231(b)(3) and relief under the Convention Against Torture ("CAT"), 8 C.F.R. § 208.16(c). The IJ held that Viktor was "ineligible for asylum since he arrived in the United States on September 17, 1997, and did not apply for asylum until November 18, 1998, more than one year after his arrival." The IJ did not, however, address Viktor's argument that extraordinary circumstances had caused the delay. With respect to Nataliya, the IJ determined that she had filed within the one-year bar, and therefore considered the merits of her asylum application.

In addressing Viktor's claim for withholding of removal and Nataliya's claims for asylum and withholding, the IJ determined that the Sagaydaks failed to establish that they would be persecuted on account of a protected category. The IJ specifically rejected the Sagaydaks' contention that Ukrainian tax auditors constitute a bona fide social group. Moreover, the IJ reasoned that the Sagaydaks were facing harm because Viktor was involved in the prosecution of corrupt officials, not because of Viktor's membership in a protected class. Thus, the IJ ruled that "in the case of [Nataliya], there is not a well-founded fear of persecution based upon one of the five grounds, and for both respondents, there is not a clear probability of persecution based upon one of the five grounds that they will be persecuted if they return to the Ukraine." Additionally, the IJ found both petitioners ineligible for CAT relief because their persecutors were private citizens, not government officials.

The Sagaydaks appealed to the BIA, arguing in part that the IJ erred by failing to determine whether Viktor had qualified for the extraordinary-circumstances exception to the one-year time bar. The BIA affirmed the IJ's decision without opinion

on November 18, 2002. The Sagaydaks filed their timely petition for review on December 16, 2002.[3]

## II.

Viktor contends that the IJ erred by not determining whether Viktor's failure to meet the one-year time bar was attributable to exceptional circumstances. We agree.

## A.

**[1]** We first consider whether we have jurisdiction to review this challenge to the IJ's ruling.[4] Normally, this court cannot consider a petitioner's claim that exceptional circumstances should excuse his late filing. *See Hakeem*, 273 F.3d at 815. This is true because, under 8 U.S.C. § 1158(a)(3), we lack "jurisdiction to review any determination of the Attorney General under paragraph (2) [of 8 U.S.C. § 1158(a)]." Paragraph (2) of § 1158(a) contains two separate provisions: the one-year filing deadline contained in subparagraph (B),[5] and the extraordinary-circumstances exception to the one-year filing deadline contained in subparagraph (D).[6] Thus, we cannot

---

[3]The same day that the petition for review was filed, the Sagaydaks also filed a motion to reopen with the BIA. The BIA denied the motion on March 10, 2003. The petitioners did not file an amended petition for review to incorporate the BIA's denial of the motion to reopen. Accordingly, the BIA's denial of the motion to reopen is not before us here.

[4]We, of course, have jurisdiction to determine whether we have jurisdiction. *Aragon-Ayon v. INS*, 206 F.3d 847, 849 (9th Cir. 2000).

[5]Subparagraph (B) provides in full: "Subject to subparagraph (D), paragraph (1) shall not apply to an alien unless the alien demonstrates by clear and convincing evidence that the application has been filed within 1 year after the date of the alien's arrival in the United States." 8 U.S.C. § 1158(a)(2)(B).

[6]Subparagraph (D) provides in full:

   An application for asylum of an alien may be considered, notwithstanding subparagraphs (B) and (C), if the alien demonstrates

review the IJ or BIA's determination that an alien failed to apply within one year of arriving in the United States *or* a determination that the delay in filing was not caused by extraordinary circumstances.

**[2]** But what if, as occurred in Viktor's case, an IJ makes no determination, even though the issue was raised by the petitioner? Although the IJ made a determination that Viktor had applied more than one year after arriving in the United States, the IJ did not consider, much less determine, whether Viktor's failure to meet the one-year time bar was caused by extraordinary circumstances. The IJ's only statement with respect to Viktor's asylum application was that "[t]he Court finds that the male respondent is ineligible for asylum since he arrived in the United States on September 17, 1997, and did not apply for asylum until November 18, 1998, more than one year after his arrival. Section 208(a)(2)(B); 8 C.F.R. 208.4(a)(2)." Both the IJ's words and his citations refer specifically to the one-year time bar; they do not address the extraordinary-circumstances exception.

**[3]** Had the IJ merely erred in making a determination under subparagraph (D), we would lack jurisdiction. 8 U.S.C. § 1158(a)(3). Here, however, the IJ's error was that he did not make "any determination" at all. The jurisdiction-stripping provision contained in § 1158(a)(3) only precludes us from reviewing "any determination" with respect to the extraordinary-circumstances exception. In light of the fact that the IJ failed to make "any determination," even though the extraordinary-circumstances issue was raised by Viktor's

---

to the satisfaction of the Attorney General either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application within the period specified in subparagraph (B).

8 U.S.C. § 1158(a)(2)(D).

attorney, we conclude that § 1158(a)(3) does not apply in this case. Quite simply, we are not reviewing a "determination," but the failure to make a determination. Thus, we hold that when, as occurred here, a petitioner alleges that his failure to file a timely asylum application was due to extraordinary circumstances and both the IJ and the BIA fail to determine whether the extraordinary-circumstances exception should apply, we have jurisdiction to review the failure to make a determination.

## B.

**[4]** We next consider whether it was error for the IJ not to determine whether Viktor's late filing was due to extraordinary circumstances. We think it goes without saying that IJs and the BIA are not free to ignore arguments raised by a petitioner. *See Chen v. Ashcroft*, 362 F.3d 611, 620 (9th Cir. 2004) (holding that "the IJ erred by failing to consider" an explanation offered by the petitioner for her brother's failure to appear and testify on her behalf). Immigration judges, although given significant discretion, "cannot reach their decisions capriciously" and "must indicate 'how [they] weighed the factors involved' and 'how [they] arrived at [their] conclusion.' " *Yepes-Prado v. INS*, 10 F.3d 1363, 1370 (9th Cir. 1993) (quoting *Dragon v. INS*, 748 F.2d 1304, 1307 (9th Cir. 1984)). Furthermore, it has long been held that the BIA's "failure to exercise its own discretion, contrary to existing regulations" is reversible error. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954).

**[5]** Although the BIA effectively ignored the issue of whether the extraordinary-circumstances exception should apply in Viktor's case, the IJ was apparently not even aware of this exception. During the removal hearing, Viktor's attorney attempted to submit evidence that the delay in filing the application was caused by Viktor's prior attorney's ineffective assistance. The IJ, however, interrupted the attorney and said:

Well, the only thing that is going to make me change my ruling is if you show me an application that was submitted before—

MR. YOUNGJOHN TO JUDGE:

I wouldn't be able to do that, Your Honor.

JUDGE TO MR. YOUNGJOHN:

Because, as I say, you can't get around clear language of the law . . . . I'm just trying to find the section on time limit. Let's see, the alien must demonstrate by clear and convincing evidence that the application was filed within one year after the date of the alien's arrival in the United States. So application filed, that would not mean beginning preparations or whatever.

MR. YOUNGJOHN TO JUDGE:

Please, for the record, can I—

JUDGE TO MR. YOUNGJOHN:

You can submit anything you want, Mr. Youngjohn. I just want you to know that I don't have—it's not within my authority, even if I wanted to do it—

MR. YOUNGJOHN TO JUDGE:

Yes, sir.

JUDGE TO MR. YOUNGJOHN:

— if I decide, you know, in this case, I think I'm going to do that, I would be reversed by the Board of Immigration Appeals.

MR. YOUNGJOHN TO JUDGE:

Yes, Your Honor.

As this colloquy demonstrates, the IJ believed that the one-year deadline was absolute and not subject to any exception. Under the IJ's understanding of the statute, so long as Viktor applied for asylum more than a year after his arrival in the United States, the IJ had no "authority" to find Viktor eligible for asylum. Indeed, the IJ was concerned that if he found an exception to the one-year time bar, he would be reversed by the BIA.

**[6]** The IJ's understanding of the INA was plainly contrary to both the statute's and the regulation's obvious meaning. Under 8 U.S.C. § 1158(a)(2)(D), the one-year time bar does not apply "if the alien demonstrates to the satisfaction of the Attorney General . . . the existence of . . . extraordinary circumstances relating to the delay in filing an application." Additionally, the agency's own regulation provides that extraordinary circumstances can excuse an alien's failure to satisfy the one-year time bar, and the regulation specifically recognizes that ineffective assistance of counsel, the basis of Viktor's extraordinary-circumstances claim, can qualify as an extraordinary circumstance. 8 C.F.R. § 208.4. Neither the statute nor the regulation is ambiguous, and neither could be interpreted any other way than including an extraordinary-circumstances exception. The IJ erred as a matter of law, and we therefore remand Viktor's asylum claim to the BIA, or, if it deems appropriate, to the IJ, for further proceedings.[7]

---

[7]In addition to the extraordinary-circumstances exception contained in the statute, Viktor also contends that the one-year time bar should be subject to equitable tolling. We need not decide whether the equitable tolling doctrine applies to the one-year time bar on asylum applications. The regulations specify that the extraordinary-circumstances exception includes claims based on ineffective assistance of counsel. 8 C.F.R. § 208.4. Thus, although a statute can also be equitably tolled on the basis of ineffective

### III.

The IJ denied Viktor's claim for withholding of removal and Nataliya's claims for asylum and withholding of removal on the basis that Viktor did not establish that the Hidro henchmen "wish[ed] to harm him due to his race, his religion, his nationality, his membership in a particular social group, or his political opinion." *See* 8 U.S.C. § 1101(a)(42)(A). The Sagaydaks challenge this determination.[8] We review for substantial

---

assistance of counsel, *see Socop-Gonzalez v. INS*, 272 F.3d 1176, 1193 (9th Cir. 2001) (en banc), the availability of relief for Viktor under the extraordinary-circumstances exception makes it unnecessary for us to decide whether the equitable tolling doctrine is applicable here. *See Rodriguez-Lariz v. INS*, 282 F.3d 1218, 1226 n.5 (9th Cir. 2002) (declining to address whether a regulatory exception for "exceptional circumstances" should apply because the petitioner's arguments were the same arguments that supported the equitable tolling claim that the court had already considered).

Indeed, we suspect that the requirements for satisfying the extraordinary-circumstances exception are identical to the showing necessary to equitably toll a statute of limitations. *See United States v. Battles*, 362 F.3d 1195, 1197 (9th Cir. 2004) (explaining in the context of the one year statute of limitation on filing a habeas corpus petition that a petitioner must demonstrate that extraordinary circumstances prevented the timely filing of a petition in order to have the statute of limitation equitably tolled); *Socop-Gonzalez*, 272 F.3d at 1193 (stating in the context of filing deadlines for motions to reopen deportation proceedings that "the party invoking tolling need only show that his or her ignorance of the limitations period was caused by circumstances beyond the party's control, and that these circumstances go beyond a garden variety claim of excusable neglect." (internal citations and quotations omitted)).

[8]The Sagaydaks also contend that the BIA erred by failing to recognize that persecution can be inflicted by non-governmental actors. In denying the Sagaydaks' CAT claim, the IJ did find that any harm would come from Hidro officials, not from government officials. Because "torture" is defined as "pain or suffering . . . inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity," 8 C.F.R. § 208.18(a)(1), this was a proper ground for denying CAT relief. The IJ did not, however, deny Nataliya's claim for asylum under 8 U.S.C. § 1158 or the Sagaydaks' claims for withholding of removal under 8 U.S.C. § 1231(b)(3) on the basis that their persecutors were not government officials.

evidence, *see Ochave v. INS*, 254 F.3d 859, 865 (9th Cir. 2001), and we conclude that the IJ's finding did not meet this standard.[9]

**[7]** To establish a nexus to the political opinion ground, the Sagaydaks must show (1) that Viktor had either an affirmative or imputed political opinion,[10] and (2) that they were targeted *on account of* that opinion. *See Njuguna v. Ashcroft,* 374 F.3d 765, 770 (9th Cir. 2004) ("He must establish that the political opinion would motivate his potential persecutors."). Viktor's status as a government employee clearly suffices to show an imputed political opinion under our case law. We have stated that we consider "persecution of those who work for or with political figures to be on account of the political opinion of their employer even if the nature of their work . . . is not in itself political." *Navas v. INS*, 217 F.3d 646, 659 n.19 (9th Cir. 2000). Viktor was aligned with the political opinion of his employer simply by the fact that he worked as a government official enforcing government policies. *See Aguilera-Cota v. INS*, 914 F.2d 1375, 1380 (9th Cir. 1990) ("[Petitioner]'s status as a government employee caused the opponents of the government to classify him as a person 'guilty' of a political opinion.").

---

[9]Initially, we reject the Sagaydaks' contention that the IJ failed to consider whether they were persecuted on account of Viktor's political opinion. While the IJ did not analyze the political-opinion category as thoroughly as he analyzed the social-group category, the IJ explicitly stated that the corrupt Hidro Corporation officials "do not wish to harm [Viktor] due to his race, his religion, his nationality, his membership in a particular social group, or his *political opinion*. They simply want to coerce him not to testify against them" (emphasis added). Thus, the IJ considered, but rejected, the Sagaydaks' claim that they were facing persecution on account of Viktor's political opinion.

[10]"Under our case law, and unchanged by *Elias-Zacarias*, an applicant can establish his political opinion on the basis of his own affirmative political views, his political neutrality, or a political opinion imputed to him by his persecutors." *Sangha v. INS*, 103 F.3d 1482, 1488 (9th Cir. 1997) (citing *INS v. Elias-Zacarias*, 502 U.S. 478 (1992)).

**[8]** Viktor also has established that his troubles with Hidro arose on account of that actual or imputed political opinion. Our cases make clear that a victim who is targeted for exposing government corruption is persecuted "on account of" political opinion. Retaliation for investigating or publicizing corruption by political figures is by its very nature a political act. *Reyes-Guerrero v. INS*, 192 F.3d 1241, 1245 (9th Cir. 1999) (holding that persecution was on account of political opinion because petitioner's prosecutorial investigation into acts of political corruption "was, by its very nature, political"). We have held, for example, that "retaliation for the act of publicizing corruption amounts to persecution on account of a political opinion" even when the petitioner "did not espouse a political theory." *Hasan v. Ashcroft*, 380 F.3d 1114, 1120 (9th Cir. 2004); *see also Njugana*, 374 F.3d at 770-71; *Grava v. INS*, 205 F.3d 1177, 1181 (9th Cir. 2000) (holding that nexus existed where government employee exposed corruption of his supervisors).

**[9]** These cases also require that the corruption being exposed have far-reaching roots. In *Hasan*, for example, the "institutionalized level of corruption" in the local political leadership that the petitioner uncovered and reported went "far beyond an individual, anomalous case." 380 F.3d at 1120. Citing *Grava*, we pointed out that " 'retaliation completely untethered to a governmental system does not afford a basis for asylum.' " *Id.* at 1121 (quoting 205 F.3d at 1181 n.3). We have therefore refused to recognize a nexus to political opinion where the alleged persecution occurred only as a result of personal animosity, rather than "a difference of political philosophies." *Zayas-Marini v. INS*, 785 F.2d 801, 806 (9th Cir. 1986); *see also Kozulin v. INS*, 218 F.3d 1112, 1117 (9th Cir. 2000) (stating that in the face of a crew member's accusation that a ship's captain stole provisions, "[t]he captain's endeavors to maintain order within his questionable enterprise, however unpalatable, do not constitute persecution on account of political opinion").

**[10]** Viktor's audit was slightly different in that it uncovered corruption within a private organization, not a government institution. Thus, Viktor's refusal to accept Hidro's bribes and abdicate his duty to testify was not a stance critical of any particular political figure or party. *Cf. Njuguna*, 374 F.3d at 770-71. Nonetheless, it implicated the foundations of Ukrainian government and was undeniably a political statement in the context of the country's evolving politics. At the time the Sagaydaks' troubles arose, Ukraine was struggling with its transition to a fledgling free-market economy. The State Department reported that the country's economy "suffered greatly" with this transition following the collapse of the Soviet Union in 1991. Corruption was rampant throughout the government, and organized criminals grew accustomed to influencing witnesses through both bribery and intimidation. *See* United States Department of State, *Ukraine—Profile of Asylum Claims and Country Conditions* 2 (June 1997) (hereinafter "*Profile of Asylum Claims*").

In 1994, a new president, Leonid Kuchma, was elected. According to the CIA's World Factbook, "Kuchma has pushed economic reforms, maintained financial discipline, and tried to remove almost all remaining controls over prices and foreign trade." These changes to Ukraine's economic system were, of course, politically charged, and they faced strong resistance in Parliament. As part of his reforms, Kuchma made substantial efforts to uncover organized crime, a policy that he implemented through the Tax Inspectorate where Viktor worked.[11] Viktor testified at his removal hearing that in 1994, the same year of Kuchma's election, Viktor took a new oath of office "that I . . . will be serving my country, do the

---

[11]The Tax Inspectorate was apparently a highly politicized agency. According to the State Department, "[n]umerous sources charge that the administration has used government agencies, particularly the Tax Inspectorate, to pressure the opposition media and businesses supporting its political opponents." Bureau of Democracy, Human Rights, and Labor, United States Department of State, *1999 Country Reports on Human Rights Practices: Ukraine* 15 (Feb. 25, 2000).

work on behalf of my country, and will be building a new country." According to Viktor's declaration, his task was to uncover "wrong and illegal use of state financial resources[, which] is one of [the] negative consequences of a 'socialist' method of conducting a national economy . . . ." Viktor's work was therefore deeply tied to the new political and economic reforms.

These changes meant the end of "businesses" like Hidro. Hidro had been closely tied to the former communist government, and was founded by a prominent member of that former government who continued to hold a government post at the time of Viktor's audit. As Viktor put it, "[t]he founder was tied to the current government, in the same way that most organized crime in the Ukraine has government ties." Consistent with the State Department's assessment, Viktor testified that bribery of government officials was a problem in Ukraine. Moreover, "if somebody has connections and . . . has a position in the government, they can create such an institution or company or private business like Hidro, which will provide the activity against the law. . . ." The new policies in the Ukraine, which from Hidro's perspective, Viktor represented, signaled the end of that system.

By adhering to the new government policies and refusing Hidro's bribes, Viktor took a political stance in opposition to the corrupt government practices that allowed Hidro to exist. Just like the petitioner in *Aguilera-Cota*, Viktor "was specifically threatened because of his perceived adherence to the government's cause." 914 F.2d at 1379. Viktor was part of a new guard within the Ukrainian government that refused to succumb to the old system of corruption and acquiescence that allowed companies like Hidro to operate. The State Department reports make clear that Hidro's scheme was part of the pervasive structure of Ukrainian politics. In *Grava*, we pointed out that "the salient question is whether Grava's actions were directed toward a governing institution, or only against individuals whose corruption was aberrational." 205

F.3d at 1181. Because "[c]orruption among governmental officials at all levels remain[ed] a serious problem" in Ukraine, *Profile of Asylum Claims* at 2, Viktor's refusal to accede to Hidro's bribery, in the context of Ukrainian politics, was a political statement.

We analyzed a similar situation in *Desir v. Ilchert*, 840 F.2d 723 (9th Cir. 1988). There, Desir refused to accede to extortion by low-level members of Haiti's ruling "kleptocracy," the Macoutes, who demanded protection money for their own personal use. *Id.* at 725. We concluded that Desir's refusal to make "contributions" was a political statement because, in that context, "[t]o challenge the extortion by which the [Haitian security forces] exist is to challenge the underpinnings of the political system." *Id.* at 727. Similarly, Viktor's actions challenged the political system of corruption by which Hidro existed and which Hidro sought to maintain through threats and bribes.

The IJ concluded that the Hidro officials were motivated to prevent Viktor's testimony, to preserve their own economic interests, and to punish Viktor "or to take revenge against him." Even assuming this conclusion was correct, it does not undermine Viktor's claim that he was persecuted on account of a protected ground. The requirement that persecution be "on account of" political opinion "does not mean persecution *solely* on account of the victim's political opinion. That is, the conclusion that a cause of persecution is economic does not necessarily imply that there cannot exist other causes of the persecution." *Borja v. INS*, 175 F.3d 732, 735 (9th Cir. 1999) (en banc) (quotation marks omitted; emphasis in original).

**[11]** That the Hidro officials may have been motivated in part by personal retribution does not mean that they did not also see Viktor as their *political* enemy. We recognize that "many persecutors have mixed motives. In such instances, personal retaliation against a vocal political opponent does not render the opposition any less political, or the opponent any

less deserving of asylum." *Grava*, 205 F.3d at 1181 n.3. Moreover, we have recognized that such motives can indeed be political. In *Desir*, for example, the Macoutes would have kept the money they sought to extort for their individual gain. Desir's refusal to pay nonetheless had a political impact because it threatened "the intimidation and fear . . . engendered" by their extortion, which "accrued to the benefit of the [Haitian] regime." 840 F.2d at 728. The Sagaydaks' troubles arose at least in part because of the political opinion imputed to Viktor. He therefore has shown that he was persecuted on account of a protected ground.[12]

## IV.

In sum, the IJ erred by failing to determine whether Viktor's late filing was caused by extraordinary circumstances. Further, the IJ's determination that the Sagaydaks were not targeted on account of a protected ground was not supported by substantial evidence. However, because substantial evidence supports the IJ's determination that the Sagaydaks were not entitled to relief under CAT, *see supra* at 4830 n.8, we deny the petition as to that claim. Thus, we grant the petition for review in part and remand so that the BIA may determine whether extraordinary circumstances exist that would excuse Viktor's failure to apply for asylum within one year of arriving in the United States, and whether the Sagaydaks have satisfied the remaining requirements for asylum and withholding of removal.[13] *See INS v. Ventura*, 537 U.S. 12, 16 (2002).

---

[12]Because we conclude that Viktor's trouble arose on account of his political opinion, we need not address his alternative argument that he was targeted on account of his membership in the "particular social group" of honest tax auditors.

[13]The Sagaydaks claim that the IJ's decision was not appropriate for the BIA's streamlining process because the IJ's decision was incorrect, the errors in the decision were material, and the legal issues raised were substantial. *See* 8 C.F.R. § 1003.1(e)(4)(I). Because we grant the petition for review, this argument is moot. *See Vukmirovic v. Ashcroft*, 362 F.3d 1247, 1253 (9th Cir. 2004).

PETITION GRANTED in part, DENIED in part, and REMANDED.

---

TASHIMA, Circuit Judge, concurring in part and dissenting in part:

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 604, provides that "no court shall have jurisdiction to review *any determination* of the Attorney General under paragraph (2)" that an alien's application for asylum is untimely.[1] 8 U.S.C. § 1158(a)(3) (emphasis added). Because the majority's reading of the statute impermissibly narrows the plain meaning of "any determination" to exclude some determinations, I respectfully dissent from its assuming jurisdiction and reviewing petitioner Viktor Sagaydak's claim that his asylum application is not time-barred.

Here, the IJ found "that the male respondent is ineligible for asylum since he . . . did not apply for asylum until . . . more than one year after his arrival." (Citing § 1158(a)(2)(B) and 8 C.F.R. § 208.4(a)(2).) Because the IJ also mistakenly "believed that the one-year deadline was absolute and not subject to any exception," Maj. op. at 4829, he did not go on expressly to rule on Viktor's contention that the extraordinary circumstances exception of § 1158(a)(2)(D) applied to his case. On this basis, the majority holds "that the IJ failed to make 'any determination,' even though the extraordinary-circumstances issue was raised by Viktor's attorney," and concludes, therefore, "that § 1158(a)(3) does not apply to this case." Maj. op. at 4827. It holds that the IJ's failure expressly

---

[1] There are two elements to the timeliness requirement. First, there is the requirement that an asylum application be filed within one year of the alien's arrival in the United States. 8 U.S.C. § 1158(a)(2)(B). There is also a "changed circumstances" and "extraordinary circumstances" exception which permits tolling the one-year period. 8 U.S.C. § 1158(a)(2)(D).

to address the extraordinary circumstances tolling provision was a failure to make any determination under § 1158(a)(2); therefore, that review is not barred. I disagree.

We have already held that in deciding whether § 1158(a)(3) applies, "we need only determine whether the IJ acted under section 1158(a)(2)." *Hakeem v. INS*, 273 F.3d 812, 815 (9th Cir. 2001). And in this case, it is clear that the IJ did so act. The only requirement is that the IJ act under § 1158(a)(2); not that he act under every, or any particular, subdivision of § 1158(a)(2). Here, the IJ expressly determined that Viktor was "ineligible for asylum" under the one-year bar of § 1158(a)(2)(B). That he was mistaken in his application of § 1158(a)(2), in believing that no tolling was available, does not mean that he did not act under § 1158(a)(2) in holding that Viktor's petition was barred by the one-year provision.

In effect, the majority is reviewing the merits of the IJ's time-bar ruling. It holds, in substance, that the IJ erred in his determination that no tolling was available and remands on that issue and directs the agency to make a redetermination of that issue. I agree with the majority that "[n]either the statute nor the regulation is ambiguous, and neither could be interpreted any other way than including an extraordinary-circumstances exception. The IJ erred as a matter of law. . . ." Maj. op. at 4829. But the fact that the IJ "erred as a matter of law" in applying the one-year time-bar means that he made an erroneous determination, not that he did not make "any determination" at all. I therefore respectfully dissent from Part II of the majority opinion.

I do, however, fully concur in Part III of the majority opinion, and in the remainder of the opinion insofar as it pertains to Nataliya Sagaydak's claim for asylum and to the Sagaydaks' claims for withholding of removal.