Dionesio Calunsag GRAVA, Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

No. 98–70981.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 11, 2000.

Filed March 7, 2000.

Brian D. Lerner, Law Offices of Marks and Acalin, Carson, California, for the Petitioner.

Joan E. Smiley, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for the Respondent.

Before: MAGILL[1], HAWKINS and THOMAS, Circuit Judges.

THOMAS, Circuit Judge:

In this appeal we consider: (1) whether the Board of Immigration Appeals erred in holding that the petitioner's written application could not be considered absent a stipulation that his oral testimony would be consistent with his written application when the petitioner affirmed under oath that all of the material in the application was true; and (2) whether a whistleblower who exposes government corruption in the course of his official duties may claim asylum on account of persecution arising from these activities. We answer both questions affirmatively and grant the petition for review.

I

Dionesio Grava, a native and citizen of the Philippines, entered the United States in July 1991 as a non-immigrant visitor authorized to stay one year. In 1994, the Immigration and Naturalization Service denied his previous request for asylum because he had not proven persecution on account of a protected ground. Subsequently, the Service issued an order to show cause charging the deportable offense of remaining in the United States longer than permitted, in violation of 8 U.S.C. § 1251(a)(1)(C)(i), *transferred to* 8 U.S.C. § 1227(a)(1)(C)(i). Grava conceded deportability and requested political asylum and withholding of deportation.

In an extensively documented asylum application, Grava detailed his persecution claims. Based on his political beliefs and activities as a policeman and customs officer, Grava claims to have suffered and fears persecution from all sides: Marcos Loyalists, Communist insurgents in the New People's Army and the Philippine military and police force—including his former supervisors. Grava's best claim is essentially that he is subject to persecution as a "whistleblower" for his efforts in uncovering entrenched government corruption by his supervisors.

Grava began his law enforcement career in 1966 while studying at graduate school, when he served as an officer in the Cebu City Police. In 1972, Grava became a police officer for the Bureau of Customs and was eventually promoted to lieutenant. Following his assignment in 1977 to the port of Mactan, he uncovered a smuggling scheme involving the Collector of Customs Timoteo Campo, who was also Grava's supervisor. In retaliation, Mr. Campo brought administrative charges against Grava, which were later cleared, and transferred him to another assignment. After being reassigned to Mactan in 1987, Grava exposed smuggling by the new Collector of Customs, Doroteo Toledo, who has family ties to the Philippine Congress and the National Bureau of Investigation; however, no one pursued Grava's allegations and he was transferred to an outlying post. In 1990, for the third time, he exposed smuggling activities involving his su-

1. The Honorable Frank J. Magill, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

pervisor, after which he was transferred in apparent retaliation. This time, authorities launched an investigation against the Collector, Doroteo Toledo, and Grava testified in defiance of Toledo's orders, leading to a prima facie case against Toledo. The local press well publicized Grava's crusade.

Shortly after testifying, Grava received various threats: telephone calls telling him his days were numbered, slashed tires, the poisoning of his pet dog and monkey, and a shirt in the mail with a black ribbon attached, signifying a death threat. Following these threats, and as soon as he could raise the money, Grava fled with his family to the United States. Grava fears that Toledo, who retained his position following the investigation, will kill him just as Toledo allegedly killed one of Grava's fellow customs officers. He argues that the Philippines remains corrupt, subject to martial law, and that extra-judicial killings still occur there.

Grava testified in support of his application on August 19, 1996. The immigration judge began the hearing by handing Grava his asylum application and declaration and asking him, under oath, whether everything contained therein was true and correct. Grava answered that it was. The judge then asked the INS counsel whether he had any objections to making the application and the supporting documentation part of the record. After reviewing the material during a recess, the INS counsel did not object. Following the recess, the immigration judge briefly questioned Mrs. Grava, then asked whether the attorneys had any questions. Grava's counsel asked only three questions; the INS counsel added only a few more. Grava's counsel concluded with brief additional questioning. Then the immigration judge gave his oral decision denying the asylum application.

On appeal, the Board criticized Grava's failure to testify and stated that it could not consider his written application as evidence absent a stipulation that the oral testimony would be consistent with the written assertions. The Board rejected the asylum claim on that basis, but noted that even if it had considered the written application, it would reject it because it did not show that the persecution suffered was on account of political opinion. Instead, the Board concluded that it was a matter of personal retaliation.

## II

██ The Board had no basis in regulations or its own precedent to disregard Grava's written application as sworn to at the deportation hearing, and to require a stipulation by the parties that his oral testimony would be consistent with his written assertions. Under the regulations applicable to this case, "[d]uring the deportation hearing, the applicant shall be examined under oath on his or her application and may present evidence and witnesses in his or her own behalf." 8 C.F.R. § 240.49(c)(4)(iii). The contrast between the mandatory "shall" and the permissive "may" is telling: an applicant need not testify on his or her own behalf, except to swear to the truth of the application, and may rest on the application alone, subject to INS examination at the hearing. Given the difficulties many applicants face at their hearings, ranging from translation difficulties to the overwhelming anxiety of facing deportation, the asylum application sometimes represents an alien's best case. In *Matter of Fefe*, 20 I. & N. Dec. 116 (BIA 1989), the Board cited this regulation in support of its holding that "[a]t a minimum ... the regulations require that an applicant for asylum and withholding take the stand, be placed under oath, and be questioned as to whether the information in the written application is complete and correct." 20 I. & N. Dec. at 118. Grava did exactly that, and the immigration judge relied on the written application for his decision.

 The Board did state in *Matter of Fefe* that "we would not anticipate that the examination would stop at this point unless the parties stipulate that the applicant's testimony would be entirely consistent

with the written materials...." *Id.* Certainly, either the applicant or the government may desire additional oral testimony to bolster or dispute credibility. However, neither *Fefe'* nor the regulations allow the Board to reject, as a matter of law, testimony limited to an affirmation that the application materials are true.[2] Further, nothing in the regulations allows the Board to require the parties to stipulate that the written materials would be consistent with oral testimony as a precondition to allowing an affirmation of the materials as evidence. Thus, the Board erred as a matter of law in rejecting the tendered testimony.

### III

A remand is warranted only if Grava were prejudiced by the Board's departure from its own regulations and precedent. *See United States v. Cerda–Pena,* 799 F.2d 1374, 1377 (9th Cir.1986). Thus, we must consider the Board's alternative finding that, even assuming the application to be true, whistleblowing does not constitute an expression of political opinion.

Whistleblowing against one's supervisors at work is not, as a matter of law, always an exercise of political opinion. However, where the whistle blows against corrupt government officials, it may constitute political activity sufficient to form the basis of persecution on account of political opinion. *See Reyes–Guerrero v. INS,* 192 F.3d 1241, 1245 (9th Cir.1999); *cf. Marquez v. INS,* 105 F.3d 374, 381 (7th Cir.1997) (writing that political agitation against state corruption might well be a ground for asylum). Refusal to accede to government corruption can constitute a political opinion for purposes of refugee status. *See Desir v. Ilchert,* 840 F.2d 723, 729 (9th Cir.1988).

Thus, official retaliation against those who expose and prosecute governmental corruption may, in appropriate circumstances, amount to persecution on account of political opinion.

Grava alleges that he was persecuted because he criticized the government and took actions against its corruption both in the course of his official duties and by external actions. There is no doubt that he received death threats and was forced to leave the country after his actions. The only question is whether he was persecuted on account of protected activity. The Board erred in concluding that Grava's whistleblowing could not constitute an expression of political opinion because he did not concomitantly espouse political theory. When the alleged corruption is inextricably intertwined with governmental operation, the exposure and prosecution of such an abuse of public trust is necessarily political. *See Reyes–Guerrero,* 192 F.3d at 1245.[3] Thus, in this case, the salient question is whether Grava's actions were directed toward a governing institution, or only against individuals whose corruption was aberrational.

Grava's position as a law enforcement officer does not per se disqualify him from asylum. To be sure, military officials cannot claim political persecution arising solely from the performance of their duties. *See Chanco v. INS,* 82 F.3d 298, 302 (9th Cir.1996), *citing Matter of Fuentes,* 19 I. & N. Dec. 658, 661 (BIA 1988) (holding that dangers faced solely due to employment as police officer do not constitute persecution). But Grava does not fear the usual job hazards of a law enforcement officer; his alleged tormentors are not mere criminals or guerrilla

---

**2.** The Board did properly hold that an immigration judge may not make an adverse credibility finding based solely on the basis of the application.

**3.** Purely personal retribution is, of course, not persecution on account of political opinion. Thus, retaliation completely untethered to a governmental system does not afford a basis for asylum. However, many persecutors have mixed motives. In such instances, personal retaliation against a vocal political opponent does not render the opposition any less political, or the opponent any less deserving of asylum. *See Gomez–Saballos v. INS,* 79 F.3d 912, 917 (9th Cir.1996).

forces. Rather, he claims, they are instruments of the government itself.

The Board found that Grava failed to establish a nexus between his political opinion and his fear of persecution, but did so on erroneous legal premises. We therefore grant the petition for review and remand to the Board for consideration of whether Grava has proven a well-founded fear of persecution arising from his whistleblowing activities.

## IV

 Grava also argues that he was denied his Fifth Amendment due process right to effective assistance of counsel in his deportation hearing because his lawyer in that proceeding failed to elicit substantial testimony about Grava's alleged persecution. This argument comes for the first time on appeal. Because such claims are correctable by the Board, Grava has failed to exhaust his administrative remedies and we are without jurisdiction to hear this claim. *See* 8 C.F.R. § 3.2; *Rashtabadi v. INS*, 23 F.3d 1562, 1567 (9th Cir.1994).

PETITION GRANTED; REMANDED.