**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NUNE ANTONYAN,
                              *Petitioner,*

                    v.

ERIC H. HOLDER JR., Attorney
General,
                              *Respondent.*

No. 07-72719

Agency No.
A098-461-609

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
May 12, 2011—San Francisco, California

Filed June 29, 2011

Before: Betty B. Fletcher and Sidney R. Thomas, Circuit
Judges, and Lee H. Rosenthal, District Judge.*

Opinion by Judge Thomas

*The Honorable Lee H. Rosenthal, District Judge for the U.S. District Court for Southern Texas, Houston, sitting by designation.

8781

**COUNSEL**

Peter Hosharian (argued) and Areg Kazaryan, Glendale, California, for the petitioner.

Anna Nelson (argued) and Annette M. Wietecha, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for the respondent.

---

**OPINION**

THOMAS, Circuit Judge:

In this appeal, we consider whether the whistleblowing doctrine extends to an asylum petitioner who faces retaliation from a notorious criminal who is protected by corrupt government officials. We conclude that it does, and we grant the petition for review.

**I**

Nune Antonyan left Armenia for fear that a dangerous criminal, with corrupt ties to high levels of the Armenian government, would retaliate against her for seeking his prosecution. Antonyan entered the United States on a non-immigrant visitor visa, while her husband and children remained in Armenia. She overstayed the visa, and a Notice to Appear issued. Antonyan conceded removability and requested relief in the form of asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"), or, alternatively, voluntary departure.

Antonyan believes her life would be in danger if she returned to Armenia because she "dared to stand up against" Hovhannesyan Andranik and a "corrupt system" in which "[a] person cannot feel . . . protected." In her removal hearing testimony, which the Immigration Judge ("IJ") found credible, Antonyan recounted events that began with her observing a drug dispute involving Andranik and culminated with her testifying about Andranik's drug dealing and his bribery of government officials who protected him. As she pursued her

complaints against Andranik up the chain of law enforcement agencies, Antonyan and her husband endured physical beatings, warnings to remain silent, and death threats from Andranik and his henchmen, as well as threats and intransigence from the government. Antonyan continues to fear Andranik and "his friends" in the police and prosecutor's offices.

## A

As Antonyan climbed the stairs to her apartment one day, she heard a man cursing and a young woman crying. Upon reaching her floor, Antonyan saw her neighbor Andranik demanding payment from the woman before he would give her more drugs. Antonyan scolded Andranik for his foul language; he told her to "get lost." Antonyan called the police, but they did nothing.

A few days later, Antonyan ran into Andranik and several of his men. Pointing her out, Andranik warned Antonyan to "keep [her] mouth shut"—she "talk[ed] too much [and was] asking for trouble." Andranik pushed Antonyan. Following the incident, she called the police again and reminded them of her prior report. The police told her to "stop calling" and to "not name that person ever again" or they would "come and punish" Antonyan.

Upset by the police inaction, Antonyan pressed on, taking the matter to the prosecutor's office. There, she relayed her story to an investigator who took Andranik's name and promised to respond.

Shortly thereafter, Andranik and his friends confronted Antonyan, demanding to know why she persisted in "complaining" to the police and prosecutors. Gesturing to his pocket, Andranik warned that "they all are depending on this" and "are all here in my pocket"; Antonyan could do "nothing" against him. Andranik pushed her and hit her face. When she

fell, he kicked her and warned that "everything" was in his "hand." If she continued "causing trouble," Andranik and his men would "deal" with Antonyan and her family.

When Antonyan's husband saw her bruises, he rushed to Andranik's apartment. Andranik refused to see him, and Andranik's associates beat Antonyan's husband, warned him to "shut [his] wife's mouth," and threatened his life. They told him to remind Antonyan of their influence with government officials, and demanded that she "stop stirring water."

After her husband's beating, Antonyan called the investigator from the prosecutor's office. The investigator told her that his superiors had forbidden him from investigating the case, and that Antonyan was "on [her] own." He warned her to protect herself: "[I]t's not a laughing matter. His threats are serious. He is a dangerous man. Beware." It occurred to Antonyan, at that moment, that Andranik was "absolutely free doing what he wanted"—including "selling drugs" and "paying off the police"—and "so was not punishable at all." She asked the investigator for help, but his hands were tied. He offered to share her story with his friend, an investigator with the National Security agency.

The National Security investigator contacted Antonyan. After hearing her story, he described Andranik as a "big scale drug dealer" with "very influential protectors" who was "not going to be easy to deal with." Police officers covered for Andranik because of their involvement in the drug trade and because he provided them money and information. Andranik was a "valuable man for them." The investigator offered to look into the matter only if Antonyan would agree to testify. She agreed.

Some time later, the National Security investigator notified Antonyan of Andranik's arrest. She went to testify at the National Security Building. When Andranik was escorted in, he again threatened Antonyan. She testified about Andranik's

threats and attacks, her husband's beating, the inaction and threats of the police, and Andranik's statements about having government officials in his pocket. She left with assurances of protection from the National Security agency.

Notwithstanding those assurances, just a few days later, while Antonyan visited family in another town, her husband called to say that two police officers came by to ask about her. The officers threatened to arrest him if Antonyan did not appear at the station the following morning. Before calling Antonyan, her husband had spoken with the National Security investigator, who reported that high-ranking government officials had intervened on Andranik's behalf, securing his release and the closure of his case. The investigator warned Antonyan's husband that he could not protect them against Andranik's serious threats.

Antonyan and her husband resolved to move to another part of Armenia. After Andranik's release, he took over their former apartment and told neighbors that he would find and punish Antonyan's family.

**B**

After the IJ denied her claims, Antonyan appealed to the Board of Immigration Appeals ("BIA"). The BIA conducted its own review of Antonyan's claims and dismissed her appeal. After acknowledging that the IJ found Antonyan credible, the BIA agreed with the IJ that she failed to establish a nexus between her mistreatment and a statutorily protected ground. Antonyan urged the BIA—as she had the IJ—that, under *Grava v. INS*, 205 F.3d 1177 (9th Cir. 2000) and *Mamouzian v. Ashcroft*, 390 F.3d 1129 (9th Cir. 2004), her exposure of corruption within the police department and other government agencies established the nexus necessary to support her claims.

The BIA concluded that Andranik's actions were not "inextricably intertwined with a government operation," but instead

"simply were the actions of an angry criminal who sought revenge after [Antonyan] reported him to the police." Because she failed to show a relationship between the harms she suffered and a protected ground, the BIA concluded that she failed to satisfy her burden of proving eligibility for asylum and, it followed, for withholding of removal. Finally, noting the absence of record evidence showing a likelihood of torture upon return to Armenia, the BIA held that Antonyan also failed to satisfy her burden of proving eligibility for protection under the CAT.

Antonyan timely petitioned for review of the BIA's decision. We have jurisdiction under 8 U.S.C. § 1252.

Where, as here, the BIA conducts its own review of the evidence and law, "our review is limited to the BIA's decision, except to the extent that the IJ's opinion is expressly adopted." *Hosseini v. Gonzales*, 471 F.3d 953, 957 (9th Cir. 2006) (citation and internal quotation marks omitted). The BIA's legal determinations are reviewed *de novo*. *Wakkary v. Holder*, 558 F.3d 1049, 1056 (9th Cir. 2009). Factual findings are reviewed for substantial evidence, *id.*, and thus "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary," 8 U.S.C. § 1252(b)(4)(B). We accept Antonyon's factual testimony "as undisputed," since the BIA did not disagree with the IJ's credibility finding. *Gormley v. Ashcroft*, 364 F.3d 1172, 1176 (9th Cir. 2004).

## II

**[1]** To demonstrate a nexus between the harm she suffered and her political opinion, Antonyan must show (1) that she held, or her persecutors believed that she held, a political opinion; and (2) that she was harmed because of that political opinion. *Baghdasaryan v. Holder*, 592 F.3d 1018, 1023 (9th Cir. 2010). The record compels the conclusion that she has made both showings; the BIA erred in holding otherwise.

## A

**[2]** "Whistle-blowing against government corruption is an expression of political opinion." *Baghdasaryan*, 592 F.3d at 1024. In determining whether an act of whistle-blowing is political, " 'the salient question' " is "whether it was 'directed toward a governing institution, or only against the individuals whose corruption was aberrational.' " *Hasan v. Ashcroft*, 380 F.3d 1114, 1120 (9th Cir. 2004) (quoting *Grava*, 205 F.3d at 1181).

**[3]** In pursuing Andranik's prosecution, Antonyan sought more than an end to his drug-dealing and violence in her community; she also hoped to expose his crooked ties to law enforcement agencies who refused to protect the citizenry. As Antonyan explained before the IJ, she directed her testimony against Andranik, a corrupt police department, and a prosecutor's office that refused to help her.[1]

**[4]** The record belies the Government's suggestion that Antonyan aimed at only a private criminal or a few public officials. To be sure, when she first contacted police, Antonyan did not know of Andranik's "very influential protectors." That her initial reports stemmed from a "personal dispute" does not render her later acts any less "political," however. *See Zhu v. Mukasey*, 537 F.3d 1034, 1045 (9th Cir. 2008) ("Although petitioner's dispute with the factory manager started out as a 'personal dispute' when he raped her, her complaint to the town government about the manager's protection was interpreted as an act of political dissent, and the police repeatedly sought to arrest her in response to that

---

[1]Antonyan's characterization of corruption in Armenian law enforcement finds support in the 2005 state department country report on Armenia. *See Zhu v. Mukasey*, 537 F.3d 1034, 1045 (9th Cir. 2008) (noting state department report as corroborating evidence). The report identifies corruption as a "significant problem in the police force and security service," perceived to be "widespread" in the Armenian government.

act."). As she pursued the matter up the chain of law enforcement agencies, the warnings, threats, and beatings she and her husband suffered made clear Andranik's corrupt ties to, and the protection he enjoyed from, the government. When she served as a witness against Andranik, Antonyan testified, *inter alia*, that: the police threatened to punish her if she did not "forget" Andranik; Andranik told her that the police and prosecutors were in his pocket; and the National Security agent told her that the police would cover for Andranik because they were themselves involved in the drug trade.

**[5]** "When the alleged corruption is inextricably intertwined with government operation, the exposure and prosecution of such an abuse of public trust is necessarily political." *Grava*, 205 F.3d at 1181; *see, e.g.*, *Sagaydak v. Gonzalez*, 405 F.3d 1035, 1043 (9th Cir. 2005) (holding that uncovering corruption within a private organization "was undeniably a political statement in the context of the country's evolving politics"); *Njuguna v. Ashcroft*, 374 F.3d 765, 770-71 (9th Cir. 2004) (finding political opinion where petitioner characterized his aid to enslaved women "as an act against the . . . regime's corruption"). Here, the record compels the conclusion that Antonyan expressed a political opinion in her unsuccessful attempts to have Andranik prosecuted.

**B**

Antonyan must also show that her persecutors were " 'motivated, at least in part, by a [ ] . . . protected ground.' " *Sinha v. Holder*, 564 F.3d 1015, 1021 (9th Cir. 2009) (explaining pre-REAL ID Act standards) (quoting *Borja v. INS*, 175, F.3d 732, 736 (9th Cir. 1999) (en banc)).[2]

---

[2]Were this a post-REAL ID Act case, Antonyan would shoulder the "additional burden" of demonstrating "that one of the five protected grounds will be *at least one central reason* for [her] persecution." *Zetino v. Holder*, 622 F.3d 1007, 1015 (9th Cir. 2010) (emphasis added).

**[6]** While the BIA correctly found that "revenge" motivated Andranik, significant credible evidence establishes that he also acted because Antyonyan sought to expose his corrupt relationships to the government. Andranik's bribes, drug business, and work as an informant made him "valuable" to the police and prosecutors, and won him protection from high-ranking officials.[3] By erroneously characterizing Andranik's acts as wholly unconnected from government, the BIA failed to credit evidence that his motives were not exclusively "personal." Antonyan "need only produce evidence from which it is *reasonable* to believe that the harm was motivated, *at least in part*, by an actual or implied ground." *Mamouzian*, 390 F.3d at 1134 (emphasis added). In his initial attacks and threats against Antonyan and her family, Andranik referred to Antonyan's reports and to his influence over law enforcement. His threats continued at her testimony against him, where Andranik heard Antonyan recount his boasts of bribery and immunity. And after his release, Andranik told Antonyan's neighbors that he would find and punish her family.

**[7]** "Purely personal retribution is, of course, not persecution on account of political opinion." *Grava*, 205 F.3d at 1181 n.3. But "where a persecutor has both personal and political motives for retaliating against a political opponent, the persecutor's mixed motives do 'not render the opposition any less political, or the opponent any less deserving of asylum.' " *Zhu*, 537 F.3d at 1043 (quoting *Grava*, 205 F.3d at 1181 n.3); *see, e.g.*, *id.* at 1045 (nexus established where Chinese woman harmed because of a personal dispute with a government official and the political act of whistleblowing); *Fedunyak v. Gonzalez*, 477 F.3d 1126, 1130 (9th Cir. 2007) (nexus established where persecution was motivated by both personal

---

[3]Andranik's influence was evident in his statements, in statements from all three law enforcement agencies, and in the agencies' refusal to help Antonyan. Antonyan's actions drew threats not only from Andranik, but also from the police, who threatened her when she called and came searching for her after Andranik's release from prison.

greed and petitioner's complaints about government extortion). The record makes clear that Andranik had inside information of Antonyan's interactions with the police, the prosecutors, and, finally, the National Security agency. Given what Andranik knew and what he said to Antonyan, we must conclude that her whistleblowing efforts fueled Andranik's retaliation.

**[8]** "[A] victim who is targeted for exposing government corruption is persecuted 'on account of' political opinion." *Sagaydak*, 405 F.3d at 1042. The record compels a finding that in his threats and attacks on Antonyan and her family, Andranik was motivated, in part, by the knowledge that she was exposing his corrupt ties to law enforcement agencies.

### III

**[9]** Antonyan also asserts that the BIA did not address her CAT claim, but the record shows otherwise. The BIA must provide "a statement of its reasons for denying the petitioner relief adequate for us to conduct our review, and we must remand for clarification if the Board fails to provide an adequate statement of the reasons for its decision." *Ghaly v. INS*, 58 F.3d 1425, 1430 (9th Cir. 1995); *see also She v. Holder*, 629 F.3d 958, 963 (9th Cir. 2010) ("Due process and this court's precedent require a minimum degree of clarity in dispositive reasoning and in the treatment of a properly raised argument."). Here, after addressing Antonyan's claims for asylum and withholding of removal, the BIA went on to find that the record does not show a likelihood that she will face torture upon returning to Armenia. As a result, the Board concluded, Antonyan failed to satisfy her burden of establishing eligibility for CAT relief. The BIA did not ignore Antonyan's CAT claim, as she suggests, and she points to no record evidence that would compel a different finding. *See Wakkary*, 558 F.3d at 1068 (affirming BIA's denial of CAT claim where petitioner provided no record evidence "that he is likely to be tortured by the actors he fears").

## IV

**[10]** We grant Antonyan's petition as to the BIA's denial of her claims for asylum and withholding of removal, deny her petition to the extent she seeks a remand for adequate consideration of her CAT claim, and remand to the BIA for further proceedings.

Costs are awarded to the Petitioner.

**PETITION GRANTED IN PART; DENIED IN PART; REMANDED.**