**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0551n.06

**No. 09-4514**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

KOBA GIORGIJEVICH KHAKHNELIDZE,
MARINE Z. GOGUADZE,
BEKA K. KHAKHNELIDZE, and
MANANA K. KHAKHNELIDZE,

     Petitioners,

v.

ERIC H. HOLDER, Jr., United States
Attorney General,

     Respondent.

_____/

**FILED**

*Aug 08, 2011*

LEONARD GREEN, Clerk

ON PETITION FOR REVIEW
FROM THE BOARD OF
IMMIGRATION APPEALS

BEFORE:    SUTTON and WHITE, Circuit Judges; and STAFFORD, District Judge.[*]

    STAFFORD, District Judge. Koba G. Khakhnelidze ("Koba"), his wife, Marine Z. Goguadze ("Marine"), and their two children, Beka K. Khakhnelidze ("Beka"), and Manana K. Khakhnelidze ("Manana") (collectively "Petitioners"), citizens of the Republic of Georgia, petition for review of a November 17, 2009, final order of the Board of Immigration Appeals ("BIA") denying their motion to reopen a final removal order dated February 26, 2009.

_____

    [*]The Honorable William H. Stafford, Jr., Senior United States District Judge for the Northern District of Florida, sitting by designation.

## BACKGROUND

Koba entered the United States on September 13, 2002, as a non-immigrant visitor for pleasure, with authorization to remain in the United States until December 3, 2002. Marine and Beka arrived as non-immigrant visitors on October 13, 2003, with authorization to stay until January 11, 2004. Manana arrived on December 31, 2004, with authorization to stay until June 30, 2005. All four stayed in the United States longer than the time permitted.

### A. Proceedings Before the IJ

Koba first applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT") on August 18, 2005, almost three years after he entered the United States, almost two years after his wife and son entered, but less than a year (almost nine months) after his daughter arrived. Koba included his wife and children as derivatives on his application for relief. After his initial application was rejected, he re-filed successfully on September 22, 2005. He indicated on his application that he was filing more than one year after his last arrival in the United States "because I was afraid that if the Government of Georgia finds out about it, [the] mafia will find and kill my family." He did not explain why he waited almost nine months after his family was at last secure in the United States to file his application.

On November 18, 2005, the Department of Homeland Security ("Department") served Petitioners with Notices to Appear on charges that they were removable under Section 237(a)(1)(B) of the Immigration and Nationality Act ("INA") because they remained in the United States for a time longer than permitted. Petitioners first appeared, *pro se*, before an immigration judge ("IJ") on December 13, 2005. The IJ continued the hearing because Petitioners had not yet retained counsel

-2-

to assist them. On October 27, 2006, Petitioners again appeared before an IJ, and again the hearing was continued because Petitioners had not yet retained counsel. When the hearing was re-convened on December 8, 2006, Vlad Sigalov ("Sigalov") for the first time appeared as counsel for Petitioners. At the December hearing, Sigalov, on behalf of his clients, conceded removability but asked for asylum, withholding of removal, and protection under CAT, all on the basis of political opinion. The case was set for a merits hearing on September 25, 2007.

Koba was the only witness who testified at the merits hearing. Koba stated that he was working as the second shift supervisor of security at the Georgian Parliament on November 8, 2001, when the security monitor for the money vault blacked out. Koba immediately went to investigate and found a colleague—the third shift security supervisor—with two other men at an open safe. The men offered Koba $100,000 not to report the theft, then threatened that, if Koba made any "mistakes," he would regret it for the rest of his life. Despite the threat, Koba set off the alarm and detained his co-worker while the other two men escaped. Koba explained: "I was taught by my parents not to be a dishonest person and all of that went in my head in a second when I was . . . standing there. And of course I did what I was suppose[d] to do."

Although the two accomplices were later apprehended, they spent only two weeks in jail because Koba's co-worker "took the blame."[1] According to Koba, the two accomplices turned out to be employees of the Department of State Security and were—like Koba's co-worker—members

---

[1] Koba testified that the accomplices were released after three days. In his original affidavit, he stated that the accomplices served two weeks in prison. In a subsequent affidavit, he stated that all three men were convicted and "sentenced to several years in prison."

of the Mafia. Koba testified at his colleague's trial, during which time the Georgian police provided

Koba with security. The colleague was sentenced to nine years in prison and was still in prison at

the time of the hearing before the IJ.

Koba was convinced that there were unknown persons behind the robbery. He knew that

"there had to be an insider who was an accomplice to the robbery in order for [the accomplices] to

escape the way they did." Koba shared his concerns with the chief of security at the Georgian

Parliament but was told that the case was closed. Koba was soon after transferred to a position at

the Tbilisi airport, namely, the position as chief officer of security in the airport's government wing.

In January 2002, a white car driven by an unknown driver almost hit Koba as he was walking

home from work. That same month, Koba received a phone call at work from an unknown

individual, suggesting that he call home to make sure everything was OK. A call to his wife

confirmed that everything was, in fact, OK. Days or weeks later, he received a phone call at home,

again from an unknown individual, who said: "Soon you are going to wish you were dead. We can

arrange for it too but not yet. You should [have] taken $100,000." When he contacted the police

about the calls, he was told that there was little the police could do based on the information

received. The police suggested that, if the calls continued, Koba should record the calls.

On June 15, 2002, seven months after the foiled robbery, Beka was kidnaped by unknown

persons. Three days later, the kidnapers called Koba and told him that his son could be found on the

side of the road near the airport. Before Koba arrived at the site, the boy—brutally beaten about the

head and bleeding profusely—had been taken by ambulance to the hospital, where he stayed for

about a month. The incident left Beka with scars on his face and no hearing. Although Koba asked the police and his work superiors to investigate the kidnaping, he was never able to learn the identity of the people who were "terrorizing" his family. Koba left Georgia for the United States three months later, without having experienced any additional acts of "terror."

When asked by his counsel why he applied for asylum more than a year after he entered the United States, Koba explained that (1) he did not speak English well when he first entered the country and he did not know what steps to take; and (2) he "could not leave [his family] alone there being terrorized and horrified over there."

The IJ offered to hear testimony from Marine, but Petitioners' counsel stated that she would merely corroborate Koba's testimony concerning Beka's condition at the hospital. The IJ accepted that Marine's testimony would corroborate Beka's trauma.

## B. **The IJ's Decision**

While finding Koba to be generally credible, the IJ denied Petitioners' requests for relief. The IJ first found that Koba's claim for asylum was statutorily barred as untimely because his application was filed more than one year after he entered the United States and because he failed to demonstrate any changed or extraordinary circumstances that would excuse the late filing.

The IJ went on to find that, even if timeliness were assumed, Koba was not entitled to asylum because he failed to demonstrate that he suffered past "persecution" in Georgia. According to the IJ, as a matter of law, the incident involving the car driven by unknown persons and the phone calls from unknown individuals did not rise to the level of persecution. While the kidnaping and physical

abuse suffered by Beka "went well beyond what is required to constitute persecution," the IJ determined that there was insufficient nexus to show that the kidnaping of Beka was either directed at Koba or constituted persecution of Koba.

The IJ next explained that, even assuming the incident involving Beka constituted persecution of Koba, Koba failed to demonstrate that the persecution was on account of a protected ground. In particular, the IJ found that there was no evidence to suggest that Koba was targeted based on his political opinion or on a political opinion imputed to Koba. As noted by the IJ, it was simply unknown why Beka was targeted, and any conclusion on that issue would be speculative.

Finally, the IJ found that Koba failed to demonstrate a well-founded fear of persecution on account of a protected ground. Finding no evidence to suggest that Petitioners would be targeted in Georgia by the Mafia or anyone else that the government was unwilling or unable to control, the IJ concluded that any future risk faced by Koba or his family in Georgia would be "extremely small" and would not be on account of a protected ground. In sum, the IJ found that Petitioners were not entitled to asylum for a variety of reasons.

The IJ also denied Petitioners' claims for withholding of removal and for protection under CAT. In essence, the IJ found that, because Petitioners failed to satisfy the lesser burden for establishing entitlement to asylum, they could "not come close" to the higher standard of proof for withholding of removal and/or protection under CAT.

## C.  **The BIA's Decision on Appeal**

Through their counsel, Mr. Sigalov, Petitioners appealed the IJ's decision to the BIA, filing a brief just over one page in length and lacking citations to the record or authority.  The BIA dismissed the appeal, noting "that the respondents have done little on appeal to challenge the Immigration Judge's decision."  The BIA went on to say that it agreed with the IJ that Koba (1) failed to show extraordinary circumstances for the delay in filing his asylum application, (2) failed to show that he suffered harm in the past, that he fears harm in the future, or that his fear has a nexus to a protected ground, and (3) failed to show that he more likely than not would be tortured in Georgia in the future with the consent or acquiescence of a public official.

## D.  **Petitioners' Motion to Reopen**

On March 27, 2009, Petitioners filed a timely motion to reopen based on claims  of ineffective assistance of counsel and changed country conditions in Georgia.  In support of their motion, Petitioners submitted supplemental materials, including an updated affidavit and I-589 form from Koba, an I-589 form and affidavit from Beka, and an I-589 form from Manana.  The updated materials completed by Koba, repeating most of the factual information provided to the IJ, did add that (1) Koba's brother was brutally attacked by someone sometime after Koba left Georgia; (2) the brother's son, Koba's nephew, was "currently in the Parliament;" and (3) all three men who were

involved in the robbery "were convicted and sentenced to several years in prison." Among other things, Beka disclosed in his affidavit that his kidnappers told him that they wanted to cause harm to his father. In his I-589 form, Beka stated:

> My father was persecuted for his actions in the Georgian Parliament Security Unit. He was an active force against government corruption. . . . In June 2002, I was kidnapped by these people who were upset with my father.

In her I-589 form, Manana largely repeated the information provided by Beka.

In their motion to reopen, Petitioners argued that their former attorney, Vlad Sigalov, was ineffective because he (1) failed to provide a legal argument that would excuse their late filed asylum application; (2) failed to adequately prepare Koba, as lead respondent, to testify; (3) failed to call Koba's family members to testify; (4) failed to inform Koba of the need to submit documentation to support his claim; and (5) failed to file a substantive brief on appeal.

Petitioners also asserted—briefly—that conditions in Georgia had changed substantially when Russia invaded Georgia, causing war to break out in August of 2008. According to Petitioners, the conflict with Russia reduced the capacity of law enforcement to provide protection, increased the probability of persecution against Koba and his family, and foreclosed any possibility of relocation to avoid the threat of persecution. Petitioners submitted news articles, country reports, and an affidavit from Marine's aunt in support of their changed-conditions argument.

In fact, the country reports revealed that the war lasted one week, with fighting concentrated in two separatist regions of Georgia, Abkhazia and South Ossetia, although some areas adjacent to the conflict zones, including the city of Gori, experienced civilian casualties and the displacement

of many people as a result of the hostilities. While noting that the war could have enduring effects, particularly in South Ossetia and Abkhazia, the country reports contained little, if any, information about how the war did affect or will continue to affect Georgian citizens living in Tbilisi, where Petitioners resided. Moreover, the affidavit submitted by Marine's aunt, whose home in Gori was destroyed during the hostilities, provides no support to Petitioners' claims that they would be persecuted if they returned to Tbilisi.

### E.  The BIA's Decision on Motion to Reopen

On November 17, 2009, the BIA denied Petitioners' motion to reopen. While finding that Petitioners complied with the procedural steps required for a motion to reopen, the BIA declined to reopen the appeal, finding Petitioners' substantive arguments unpersuasive. The BIA first determined that Petitioners presented no legal or factual basis that would alter the IJ's conclusion that Koba failed to demonstrate extraordinary circumstances excusing his late-filed asylum application.

The BIA next determined that Petitioners not only failed to establish counsel's deficiencies, but they also failed to prove that counsel's performance caused them prejudice. In particular, the BIA noted that Koba was able to present a detailed statement before the IJ in which he consistently said that the perpetrators sought retribution against him because he arrested them and testified against them at trial. The BIA also noted that, with the motion to reopen, Koba submitted an affidavit in which he—again—attributed the harm suffered by his family to his arrest of and testimony against former KGB members for attempted robbery, actions that Koba characterized as

a challenge to "government corruption." Finally, the BIA suggested that the sworn statement submitted by Beka—that his kidnapers took him to harm his father—was entirely consistent with the IJ's finding that the kidnapers sought vengeance against Koba because he arrested them for robbery. The BIA thus determined that, even with the materials submitted with their motion to reopen, Petitioners failed to establish a nexus between the harm suffered and/or feared and the expression of a political opinion. Such failure proving fatal to Petitioners' claims of asylum and withholding of removal, the BIA concluded that Petitioners also failed to establish any prejudice from Sigalov's performance. The BIA accordingly declined to reopen removal proceedings based on ineffective assistance of counsel.

The BIA likewise declined to reopen based on Petitioners' claims of materially changed country conditions. With little discussion and no mention of the country reports, the BIA concluded that Petitioners failed to show how changed country conditions materially altered their asylum and withholding claims.

## **STANDARD OF REVIEW**

A decision to grant or deny a motion to reopen immigration proceedings is within the "broad discretion" of the BIA. *I.N.S. v. Doherty*, 502 U.S. 314, 323 (1992); 8 C.F.R. § 1003.2(a). The court accordingly reviews the denial of a motion to reopen for an abuse of discretion. *Haddad v. Gonzales*, 437 F.3d 515, 517 (6th Cir. 2006). The court will find an abuse of discretion only if the denial of the motion to reopen was made "without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination against a

particular race or group." *Id.* (citation & internal quotation marks omitted). Where, as here, the BIA

adopts and affirms the decision of the immigration judge and provides additional reasoning of its

own, this court reviews both the decision of the immigration judge and the decision of the BIA.

*Lazar v. Gonzales*, 500 F.3d 469, 474 (6th Cir. 2007).

Factual findings are reviewed under the substantial-evidence standard meaning they "are

conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."

*Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009) (internal quotation marks and citations omitted).

Questions of law are reviewed *de novo*. *Sako v. Gonzales*, 434 F.3d 857, 863 (6th Cir. 2006). We

grant substantial deference to the BIA's interpretation of the INA and accompanying regulations.

*Morgan v. Keisler*, 507 F.3d 1053, 1057 (6th Cir. 2007).

## LAW

### A. Asylum

Asylum may be granted to a "refugee," defined as any person who is unable or unwilling to

return to his home country because of past persecution or a well-founded fear of future persecution

on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1). The applicant for asylum bears the burden of establishing

"refugee" status. *Id.* at § 1158(b)(1)(B)(i).

Indeed, the applicant must "establish that race, religion, nationality, membership in a particular social

group, or political opinion was or will be at least *one central reason* for persecuting the applicant."

*Id.* (emphasis added). The applicant's testimony "may be sufficient to sustain the applicant's burden

-11-

without corroboration, but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee." *Id.* at § 1158(b)(1)(B)(ii). Although the applicant "cannot be expected to provide direct proof of [a] persecutor['s] motives," a court may not presume that persecution is on account of one of the statutory grounds. *INS v. Elias-Zacarias*, 502 U.S. 478, 483 (1992). "Where a court cannot state with conviction what motivated the purported persecutor, the court must defer to the BIA's own findings under the deferential substantial-evidence standard." *Zoarab v. Mukasey*, 524 F.3d 777, 780 (6th Cir. 2008) (quotation marks omitted).

For purposes of the INA, opposition to government corruption may provide evidence of an alien's political opinion or give a persecutor reason to impute such beliefs to an alien. *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004) (collecting cases). In considering whether opposition to corruption constitutes a political opinion, "[t]he important questions . . . are whether the applicant's actions were directed toward a governing institution, or only against individuals whose corruption was aberrational, and whether the persecutor was attempting to suppress a challenge to the governing institution, as opposed to isolated, aberrational acts of greed or malfeasance." *Yueqing Zhang v. Gonzales*, 426 F.3d 540, 548 (2d Cir. 2005). "Asylum is not available to an alien who fears retribution solely over personal matters." *Zoarab*, 524 F.3d at 781.

The BIA recently addressed the issue of when opposition to corruption constitutes an expression of political opinion, stating:

> Campaigning against state corruption through classic political activities such as
> founding or being active in a political party that opposes state corruption, attending

> or speaking in political rallies on the issue of eradicating state corruption, or writing or distributing political materials criticizing state corruption would likely constitute the expression of political opinion or may lead a persecutor to impute such an opinion to an alien. *See Musabelliu v. Gonzales*, 442 F.3d 991, 995 (7th Cir. 2006) (stating that "[s]omeone who campaigns against the government and urges the voters to throw the rascals out is engaged in political speech," as is "someone who writes an op-ed piece or otherwise urges the people to rid themselves of corrupt officials"). It is also possible that exposing or threatening to expose government corruption to higher government authorities, the media, or nongovernmental watchdog organizations could constitute the expression of a political opinion.

*Matter of N-M-*, 25 I&N Dec. 526 (BIA 2011). The BIA stressed that it is not enough for the alien to demonstrate that his acts manifested a political opinion; the alien must also demonstrate that the persecutor's motive to persecute arose from the alien's political beliefs. *Id.* An alien, that is, must provide some direct or circumstantial evidence of the persecutor's motive. *Id; see also Khozhaynova v. Holder*, 641 F.3d 187, 195-96 (6th Cir. 2011) (explaining that an alien must prove not only that he acted based on a political opinion but also that his actions were interpreted as such by his alleged persecutors). "[S]imply demonstrating resistance to pressure to engage in certain acts and consequent retaliation for this resistance is insufficient" to satisfy the alien's burden. *Matter of N-M-*, 25 I&N Dec. 526 (citing *Elias-Zacarias*, 502 U.S. at 483).

**B. Withholding of Removal**

Eligibility for withholding of removal is based on the same five grounds that form the basis of an asylum claim. To merit withholding of removal, an alien must demonstrate "a clear probability" of persecution on account of a protected ground, which is a stricter standard than the

"well-founded fear" standard applicable to asylum applications. *Ceraj v. Mukasey*, 511 F.3d 583, 594 (6th Cir. 2007). Accordingly, if an alien is ineligible for asylum, he or she is likewise ineligible for withholding of removal. *Id.*

## DISCUSSION

### A. Political Opinion

Among other things, Petitioners challenge the BIA's determination that there was insufficient evidence to support the conclusion that Petitioners were targeted on the basis of Koba's implied or actual political opinion. A review of the entire record convinces us that the BIA was correct.

Koba submitted his application for asylum on or about March 15, 2005, roughly 21 months before he hired Sigalov as counsel. Attached to his application was an affidavit that described in great detail the basis for his request for asylum and withholding of removal—a request that evolved from a single event that occurred on November 8, 2001, when Koba was working as chief of the second-shift security guards at the Georgian Parliament. Briefly, Koba foiled a robbery attempt at the Parliament on that day, apprehended one of the three would-be robbers, refused the robbers' offer of $100,000 to let them go, later helped with the prosecution of the three individuals, all the while sharing his concerns about the robbery with the Parliament's Chief of Security. He explained that he "did the only thing any honest man would do." Not once, in his lengthy affidavit, did he use the word "corruption" or suggest that his actions were a manifestation of his opposition to corruption.

In the months soon after the attempted robbery, Koba received two threatening phone calls, one in which the unknown caller said: "You should [have] taken $100,000." Koba also experienced a near-hit by a white "Volga." Seven months after the robbery, his son, Beka, was kidnaped and badly beaten by someone driving a white Volga. While Koba attributed these acts of "persecution" to his actions with respect to the robbery attempt, he provided no evidence from which the actual motives of the alleged persecutors could be gleaned.

When he testified before the IJ with the assistance of Sigalov, Koba—in essence—repeated the information that he had earlier provided in his affidavit. Summing up his actions the day of the robbery attempt, he explained: "And of course I did what I was suppose[d] to do." Again, he never used the word "corruption," and he described none of the "classic political activities" suggestive of a campaign against government corruption. *See Matter of N-M-*, 25 I&N Dec. at 526. As to the persons who "terrorized" him and his family, Koba could not say who they were or why they acted as they did.

With his motion to reopen, Koba submitted (1) an updated application (I-589 form) in which he, for the first time, described the three would-be robbers as "part of a large regime of corrupt government officials;" (2) I-589 forms from his son and daughter, who both stated that their father "was an active force against government corruption" and that their persecutors were upset with their father's anti-corruption activities; and (3) an affidavit from Beka in which Beka stated that his kidnapers told him that they wanted to harm his father. Notably, with a few minor exceptions, the *facts* recounted in Petitioners' submissions on motion to reopen were the same as the *facts* in

Petitioners' original submissions. Petitioners simply re-characterized the evidence, adding the terms "corrupt" and "corruption" to their submissions.

Even if we were to assume that Koba was motivated by something other than a desire to do—in his words—"the only thing any honest man would do" or "what I was suppose[d] to do," the motives of the alleged persecutors—whoever they were—are unknown. That Petitioners now *assert* that their persecutors were motivated by Koba's newly-characterized "anti-corruption" activities does not *establish* what the persecutors' motives were. Indeed, IJ and the BIA found, and we agree, that the evidence supports vengeance or retribution as a motive at least as much, if not more, than any other motive proposed by Petitioners.

Because Petitioners have failed to prove that they were persecuted on account of Koba's political opinion, they were not, and are not, entitled to either asylum or withholding of removal.

## B. <u>Ineffective Assistance of Counsel</u>

To succeed on an ineffective-assistance claim, a petitioner must show "that he was prejudiced by his representative's performance." *Matter of Lozada*, 19 I. & N. 637, 638 (1988). In this case, that means, most pertinently, that Khakhnelidze had to show that the materials attached to his motion to reopen filled a gap in the evidence left by his prior counsel—that there was a nexus between his persecution and his political opinion. Prejudice is not presumed, and the applicant bears the burden of establishing it. *Ikharo v. Holder*, 614 F.3d 622, 631 (6th Cir. 2010).

To establish this nexus, Khakhnelidze had to show that (1) a political opinion motivated his efforts to stop and investigate the robbery; (2) his persecutors interpreted those efforts to be political;

and (3) his persecutors targeted him on account of his political opinion. *See* 8 U.S.C. § 1101(a)(42) (persecution must be "on account of . . . political opinion"). No one disagrees that the BIA correctly concluded that he failed to make these showings in his original petition and in his initial presentation to the IJ and the BIA. The question is whether the BIA correctly found that his new materials, attached to his motion to reopen, do not materially change things. They do not, as they are merely cumulative of the original evidence or add new labels to the same evidence.

Khakhnelidze offers no new material evidence that a political opinion motivated his actions. At the original hearing, he testified that he "did what [he] was suppose[d] to do" and that he stopped the robbery because he "was taught by [his] parents not to be a dishonest person." Promoting honesty and doing one's job as a security officer, admirable as they are, do not amount to a political opinion. The only new materials on this issue come in the form of a sentence in the new I-589 applications from two of his children, Beka and Manana, which says in both places that Khakhnelidze "was an active force against government corruption." But that is a label, not evidence. No evidence at the original hearing or in the motion to reopen shows that Khakhnelidze acted because of a political opinion, as opposed to the basic requirements of his job.

Nor has Khakhnelidze shown that his persecutors interpreted his actions as political or persecuted him on account of a political opinion. The BIA found no such evidence in the original hearing. Beka's new I-589 adds only that "I was kidna[p]ed by these people who were upset with my father," and his new affidavit adds only that "I know that I was kidna[p]ed by the people who were threatening my father" and that "[t]hey told me they wanted to cause harm to my father." Yet

these statements do not meet Khakhnelidze's burden of establishing prejudice. The statements show that Beka was kidnaped because Khakhnelidze stopped the robbery, not because of his political opinions. Beka's unelaborated statement—in the I-589—that the persecutors "are upset with my father's anti-corruption activities," adds nothing either. This, too, is a label, not evidence that the persecutors believed he stopped the robbery because of any political opinion or persecuted him for that reason. And of course being convicted of a robbery is likely to make even the most forgiving soul "upset" with his accusers.

But even if there were new evidence, as opposed to new labels, and even if it showed that Khakhnelidze was working to end government corruption, as opposed to doing his work as a security officer, that alone would not turn his actions into political activity or show that his persecutors acted on account of his political opinion. Two cases illustrate the point. In *Marku v. Ashcroft*, 380 F.3d 982 (6th Cir. 2004), the applicant worked as the chief finance officer of a government-owned tobacco company. Her supervisor ordered her to manipulate the company's balance sheet to hide losses, and Marku refused, triggering a series of threats. *Id.* at 983–84. Marku, the court held, had "present[ed] no evidence that any of her actions were ideologically motivated or that . . . her alleged persecutor[] perceived them as such." *Id.* at 986–87. Her motivation instead "was her desire not to go to jail." *Id.* at 987. In *Khozhaynova v. Holder*, 641 F.3d 187 (6th Cir. 2011), the owner of a Russian wholesale grocery store would not pay extortion demands, leading the extortionists to burn the store and beat, rob and rape her. *Id.* at 189–90. This court denied asylum because "mere refusal to pay extortion demands does not constitute a political opinion" and because "there is no evidence

-18-

that the alleged perpetrators knew or cared what Khozhaynova's political opinion might be." *Id.* at 195–96.

So too here. Khakhnelidze presents evidence of one incident—his reporting of a theft—which was consistent with his job description and which led to retaliation against him by the thieves after they were caught and sent to jail. The record fully supports the BIA's original determination that this retaliation was not on account of political opinion, as opposed to anger at the source of their legal troubles. And Khakhnelidze's new materials do not show that this proceeding would have come out differently had these additional statements been before the BIA.

This case is a far cry from *Grava v. I.N.S.*, 205 F.3d 1177 (9th Cir. 2000), *Reyes-Guerrero v. I.N.S.*, 192 F.3d 1241 (9th Cir. 1999), and *Desir v. Ilchert*, 840 F.2d 723 (9th Cir. 1988). As our decision in *Marku* notes, "it was clear that the . . . petitioners" in these Ninth Circuit cases "were being persecuted *because of* an imputed political opinion." *Marku*, 380 F.3d at 988. The petitioners were: a customs officer who received death threats after his "crusade" to expose three smuggling schemes conducted over 14 years by his supervisors (*Grava*); a member of Colombia's Conservative Party who received death threats from people calling him "a Conservative Party stooge" after he investigated and prosecuted corruption in the opposition Liberal Party (*Reyes-Guerrero*); and a member of a small anti-corruption organization who was threatened, arrested and assaulted after resisting extortion by government security forces (*Desir*). "In each of these cases, the petitioners were on relatively public campaigns against wide-spread corruption," and they suffered persecution on account of those efforts. *Marku*, 380 F.3d at 988. Today's case does not involve similar evidence

of a political opinion, nor do Khakhnelidze's new materials show a nexus between his persecution

and a political opinion. Lacking evidence of such a nexus under the old evidence and the new, the

BIA properly rejected his ineffective-assistance claim.

## C. Evidence of Changed Country Conditions

Petitioners contend that the BIA erred by refusing to consider some of the documents

submitted with their motion to reopen as evidence of changed country conditions. We find no merit

to such contention.

Petitioners apparently assume that the BIA "refused" to consider some of the documents

submitted with their motion to reopen—State Department country reports and Petitioners' updated

I-589 forms—because the BIA did not mention those documents in its decision. In considering a

motion to reopen, however, the BIA is not required "to mention every piece of evidence before it or

every logical element of a motion." *Zhang v. Mukasey*, 543 F.3d 851, 854 (6th Cir. 2008). The BIA

need only analyze and explain the basis on which its decision was made. *Id.* The BIA owes no "duty

to rehearse" the rest of an alien's evidence for the sake of completeness. *Id.* at 855.

Petitioners stated in their motion to reopen that they feared persecution based on their

Georgian ethnicity as a result of Russia's 2008 invasion of Georgia. While referencing some but not

all of the evidence submitted by Petitioners in support of their motion to reopen, the BIA concluded

that Petitioners failed to show how the Russian invasion materially altered their asylum and

withholding claims. Perhaps the BIA could have better explained its conclusion; however, our review of all of the evidence of changed country conditions leads us to the same conclusion.

The country reports reveal that the war lasted one week, with fighting concentrated in two separatist regions of Georgia, Abkhazia and South Ossetia. To be sure, the materials depict general violence and citizen displacement, particularly in Abkhazia and South Ossetia but also in some adjacent areas—including the city of Gori where Marine's aunt lost her home as a result of the hostilities. While noting that the war could have enduring effects, the country reports contained little, if anything, to suggest that Petitioners would be persecuted based on their Georgian ethnicity should they return to Tbilisi, where they once resided.

## D. **Late-Filed Response**

Finally, Petitioners contend that the BIA erred by considering the Attorney General's late-filed response to Petitioners' motion to reopen. In fact, the Attorney General filed his response to Petitioners' motion to reopen two days late. Petitioners moved to strike the response, and it appears that the BIA never ruled on that motion. Under the regulations, "[a] motion shall be deemed unopposed unless a timely response is made." 8 C.F.R. § 1003.2(g)(3). Under those same regulations, however, the "Board may, in its discretion, consider a brief filed out of time." *Id.* The BIA thus had the discretion to consider the Attorney General's responsive brief. Furthermore, deeming a motion to reopen as unopposed does not result in an automatic grant of the motion. Where, as here, Petitioners failed to establish grounds for relief, the BIA retains the discretion to deny relief even when no responsive brief is filed.

## **CONCLUSION**

For these reasons, we deny the petition for review.

No. 09-4514
*Khakhnelidze, et al. v. Holder*

**WHITE, J.**, concurring in part and dissenting in part. Because I conclude that Petitioners presented substantial evidence supporting that Lead Petitioner and his family were targeted and persecuted on the basis of his implied or actual opposition to Georgian government corruption and/or whistleblowing, and that Petitioners were prejudiced by ineffective assistance of their first counsel, I respectfully dissent. As to the remaining claims, I join in the majority opinion.

Lead Petitioner was working as a security officer for the Georgian government (Georgian Parliament) when he discovered a colleague (also a security officer in the Parliament) and two others attempting to rob the Parliament safe. The robbers offered him $100,000 to "look the other way." Lead Petitioner testified against his robber-colleague, and later attempted to find out who was behind the plot to steal the money. He repeatedly asked his supervisor at the Georgian Parliament/government about what happened, and was told that it was not his job to "investigate" and that the case was "closed." Shortly after, Lead Petitioner was transferred from his position at the Parliament to a position at the airport.

After being transferred from the Georgian Parliament to the airport, Lead Petitioner was almost run over by a car, a white Volga, he received several threatening phone calls, and his son was kidnapped (by men in a white Volga) for several days, beaten so severely that he lost his hearing, and left by the side of the road to the airport. Lead Petitioner's supervisors refused to investigate his son's kidnaping. Lead Petitioner left Georgia several months after these incidents took place. Subsequently, his brother was beaten (but not robbed) in the apartment complex where the family lived.

-23-

Petitioners presented ample circumstantial evidence that the Georgian Parliament/government attempted to stop Lead Petitioner from pursuing an investigation and/or discovering who was behind the attempted robbery of the Parliament safe. The evidence strongly suggests that the robbery was planned internally, and that by uncovering the robbery, testifying against one of the robbers, a fellow security officer in the Georgian Parliament, and attempting to investigate who was behind the foiled robbery, Lead Petitioner was actively rooting out government corruption.

The BIA's decision denying Petitioners' Motion to Reopen refers only to two supplemental documents submitted with Petitioners' Motion to Reopen, Lead Petitioner's affidavit and Beka's affidavit, and does not refer to the updated I-589 forms, which specifically note that Koba and his family were targeted because he opposed governmental corruption.

Lead Petitioner's and Beka's I-589 forms, which were sworn under penalty of perjury, supported that a nexus existed between Lead Petitioner's stance against Georgian government corruption or his whistleblowing and Petitioners' past and future persecution, contrary to the conclusion of the BIA.

If the BIA reviewed the sworn I-589 forms and concluded that they did not support that Lead Petitioner was persecuted on the basis of political opinion, it erred. Whistleblowing "against corrupt government officials [] may constitute political activity sufficient to form the basis of persecution on account of political opinion. Refusal to accede to government corruption can constitute a political opinion for purposes of refugee status." *Grava v. INS*, 205 F.3d 1177 (9th Cir. 2000) (citing *Reyes-*

*Guerrero v. INS*, 192 F.3d 1241, 1245 (9th Cir. 1999), and *Desir v. Ilchert*, 840 F.2d 723, 729 (9th Cir. 1988)); *see also Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004) (recognizing that opposition to government corruption can constitute a political opinion).

Similar to the instant case, the petitioner in *Grava*, 205 F.3d 1177, was a former law enforcement government official who uncovered smuggling schemes in the Customs office and testified against his supervisor. After testifying, Grava received threatening telephone calls, his tires were slashed, and his pets poisoned. On appeal from the IJ's denial of Grava's asylum application, the BIA determined that whistleblowing did not constitute an expression of political opinion. 205 F. 3d at 1181. The Ninth Circuit reversed, concluding that the BIA's determination was based on "erroneous legal premises":

> Whistleblowing against one's supervisors at work is not, as a matter of law, always an exercise of political opinion. However, where the whistle blows against corrupt government officials, it may constitute political activity sufficient to form the basis of persecution on account of political opinion. *See Reyes-Guerrero v. INS*, 192 F.3d 1241, 1245 (9th Cir. 1999); *cf. Marquez v. INS*, 105 F.3d 374, 381 (7th Cir. 1997) (writing that political agitation against state corruption might well be a ground for asylum). Refusal to accede to government corruption can constitute a political opinion for purposes of refugee status. *See Desir v. Ilchert*, 840 F.2d 723, 729 (9th Cir. 1988). Thus, official retaliation against those who expose and prosecute governmental corruption may, in appropriate circumstances, amount to persecution on account of political opinion . . . .
>
> [] The Board erred in concluding that Grava's whistleblowing could not constitute an expression of political opinion because he did not concomitantly espouse political theory. When the alleged corruption is inextricably intertwined with governmental operation, the exposure and prosecution of such an abuse of public trust is necessarily

political. *See Reyes-Guerrero*, 192 F.3d at 1245. Thus, in this case the salient question is whether Grava's actions were directed toward a governing institution, or only against individuals whose corruption was aberrational.

Grava's position as a law enforcement officer does not per se disqualify him from asylum. To be sure, military officials cannot claim persecution arising solely from the performance of their duties. But Grava does not fear the usual job hazards of a law enforcement officer; his alleged tormentors are not mere criminals or guerrilla forces. Rather, he claims they are instruments of the government itself.

The Board found that Grava failed to establish a nexus between his political opinion and his fear of persecution, but did so on erroneous legal premises. We therefore grant the petition for review and remand to the Board for consideration of whether Grava has proven a well-founded fear of persecution arising from his whistleblowing activities.

*Grava*, 205 F.3d at 1181-82 (citations and footnote omitted).

Ineffective assistance of counsel occurred at the merits hearing, where original counsel, whom Petitioners retained because he could speak Russian, called only Lead Petitioner to testify and questioned him quickly and cursorily. Lead Petitioner testified through a translator at the merits hearing. Original counsel represented to the IJ that the testimony of Lead Petitioner's wife was unnecessary because she would merely corroborate Lead Petitioner's testimony. He also represented that Beka, the son who was kidnaped and severely beaten, was unable to testify, when in fact Beka could have done so with the aid of an interpreter who understood sign language, and likely would have testified that his kidnappers indicated to him that his father's attempts to further investigate the foiled robbery were behind his kidnapping.

-26-

In Beka's I-589 updated application, sworn under the penalty of perjury, which was attached to the Motion to Reopen, Beka stated that Lead Petitioner "was an active force against government corruption," and that Beka was kidnapped by individuals "who were upset with [his] father."

Original counsel stated in his extremely brief summation that Lead Petitioner had been unable to obtain documentation, whereas Lead Petitioner contends that his attorney never told him that such information was necessary and that he would have been able to obtain it.

In sum, Petitioners' original counsel failed to (1) argue that extraordinary circumstances excused the late-filing of Lead Petitioner's asylum petition; (2) inform Lead Petitioner that he should obtain additional documentation, such as affidavits from his brother and Beka's medical records; (3) prepare Lead Petitioner for his testimony before the IJ; (4) call Beka and other family members to testify at the merits hearing; and most importantly, (5) argue that there was a nexus between the violence against Lead Petitioner and his family and his political opinion/whistleblowing, and 6) in the appeal he drafted cite any caselaw or present argument regarding such a nexus.[1] Original counsel's woefully inadequate brief on appeal to the BIA was three paragraphs, and reads as follows:

> We respectfully ask the Board of Immigration Appeals to consider re-evaluating Respondent's case. Although Respondent did not have much by way of physical evidence, we believe that his testimony was credible in that he had detailed facts, including names, to substantiate his experience. It is Respondent's contention that he, and his family, face great danger if they are compelled to return to the Republic of Georgia. The same individuals who attempted to bride [*sic* bribe] the

---

[1]In denying the appeal, the BIA noted that "respondents have done little on appeal to challenge the Immigration Judge's decision," supporting the argument that counsel presented no arguments controverting the IJ's decision.

Respondent remain free and are well aware of Respondent's willingness to testify against them.

Furthermore, he faced continued threats not just to himself, but to his family. His son, while taken by force by unknown individuals, sustained serious injuries. Respondent's son lost his hearing and requires special care. Respondent and his family were traumatized by this series of events.

It is Respondent's position that his honesty and dedication to his job put him in this peril. The authorities were simply unwilling or uninterested in helping Respondent secure his and his family's safety.

Under these circumstances, I cannot agree that Petitioners failed to prove any prejudice resulting

from their first attorney's performance.

For these reasons, I would grant Petitioners' petition for review.